Filed 9/13/19

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>LUIS ARRELLANES AVILES,<br><br>    Defendant and Appellant. | F073846<br><br>(Tulare Super. Ct. Nos. VCF321552<br>& VCF283307)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Nora S. Weyl, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

**\*** Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, Part VI of the Discussion, the Disposition, and the Concurring Opinion are certified for publication.

**SEE CONCURRING OPINION**

# **INTRODUCTION**

Appellant/defendant Luis Arrellanes Aviles led officers on a foot pursuit through houses, garages, and backyards in a residential neighborhood. An officer found defendant hiding inside a bedroom closet of a residence and ordered him to surrender; the officer did not realize that defendant was in possession of a firearm. Instead of complying with the officer's orders to surrender, defendant fired multiple gunshots and wounded two officers. One officer was shot four times, and the second officer was shot once. The other officers at the scene returned fire, and defendant finally surrendered after being wounded.

Defendant was charged and convicted of counts 1 and 2, the attempted premeditated murders of the two police officers (Pen. Code, §§ 664/187, subd. (a))[1] with firearm enhancements (§ 12022.53, subd. (d)); and count 3, possession of a firearm by a felon (§ 29800, subd. (a)(1)). Defendant was sentenced to an aggregate term of 80 years to life in state prison, plus a consecutive term of two years for his plea in a separate case for assault with a deadly weapon – a cutting instrument – by means of force likely to produce great bodily injury. (§ 245, subd. (a)(1)).

We affirm defendant's convictions in counts 1, 2, and 3 and the jury's findings on the firearm enhancements.

In the published portion of this opinion, we address defendant's reliance on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) to argue that the trial court violated his constitutional rights to due process and equal protection by ordering him to pay certain fines, fees, and assessments without finding he had the ability to pay those amounts. We find *Dueñas* was wrongly decided, and that a constitutional challenge to the imposition of fines, fees, and assessments should be based on the Excessive Fines Clause of the Eighth Amendment instead of the due process rationale utilized in *Dueñas*.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

We will remand the matter for the trial court to address specific sentencing issues as set forth in the unpublished portion of this opinion, and otherwise affirm defendant's convictions, the firearm enhancements, and the fines, fees, and assessments imposed.

## FACTS[*]

On May 16, 2013, Visalia Police Department Officers Collins and Alfano were on patrol. They were members of the gang suppression unit and drove an unmarked police cruiser that was a black Dodge with a light bar inside the front windshield.

Officer Alfano testified that even though the vehicle was not marked, he knew that gang members in the area recognized the car and knew the police were inside. Gang members referred to the unit as the "black attack." The officers were wearing black uniforms and tactical vests that displayed their badges.

Around 1:00 p.m., the officers were patrolling the "Holiday Homes" area of Visalia. In their experience, the area recently had a large amount of gang activity and gang-related drug sales and shootings. The officers also had numerous contacts with Norteño gang members in the area.

The officers turned onto North Cain Street and saw a black Hyundai Sonata traveling in front of them. The vehicle turned very quickly into a residential driveway in in the middle of the block. As the vehicle made the turn, it was going so fast that the front end of the car hit the driveway's pavement and the vehicle bounced.

Officer Collins testified both doors of the car flew open and two people got out. The two occupants were later identified as defendant and Phillip Marquez. Defendant got out of the driver's side and Marquez got out of the passenger side.

Officer Alfano testified defendant "looked hard" in the officers' direction, "held the look for a moment," and then began "to fast walk towards the front of the residence." Alfano testified defendant "wasn't … just strolling up to the front door, he was walking

---

[*] See footnote, *ante*, page 1.

3.

at a fast pace toward the gate on the north side of the residence." Marquez also walked towards the front of the residence.[2]

The officers decided to stop and check out the vehicle; they pulled their car to the curb in front of the residence.

**Defendant Jumps the Fence**

Officer Collins testified that as soon as he got out of the patrol car, the driver of the vehicle, identified as defendant, "looked at us and turned around, ran the other way and hopped a fence." Collins testified that he believed the driver "definitely saw us, and that's why he pulled into the driveway."

When defendant hopped the residence's fence, Officer Collins scaled the same fence and intended to follow him. Collins lost sight of defendant and returned to the patrol car to call for backup assistance.

**Detention of Marquez**

When defendant jumped the fence, Marquez was still standing in front of the residence where defendant had stopped the car. Officer Alfano immediately ordered Marquez to stop. Marquez complied with the order. Alfano detained Marquez, conducted a patdown search, and placed him in the back of his patrol car.

There was no evidence that Marquez was in possession of any contraband.

**The Search for Defendant**

Numerous officers responded and set up a perimeter in the residential area where defendant had jumped the fence, in the area between North Cain and North Stover Streets. The officers contacted residents and obtained their permission to search their homes and backyards.

---

[2] The person who lived in the residence testified that she heard a loud noise and saw the officers looking for someone. She did not recognize the car in her driveway, and there was no evidence that she knew defendant or Marquez.

4.

A resident on North Cain heard noise like someone had jumped his fence. The resident found a pair of white shoes in the backyard that did not belong to him and later pointed them out to the police.

A resident on North Stover Street saw someone with a gun run in front of her house. The man was a police officer, but she did not realize it at the time. She became frightened and hid in a closet with her children. After a short time, she thought she heard someone try to open a door in the house. She stayed in the closet with the children. About 10 minutes later, she decided to leave the closet since it had been quiet. She walked through the house and everything seemed normal. She decided to lock the door that led from her house into the garage. When she opened the door to the garage, she found a man was in the garage, and he was holding a gun. He was wearing a beige T-shirt and white or beige shorts with dark checkered squares. She did not see his face. He was holding the doorknob and trying to keep the garage door closed. She screamed and closed and locked the door. She ran to the front of her house, saw the police officers in the street, and yelled that someone was in her garage with a gun.

Officer Ferreira, who was searching the area, stood up on a fence at the house on the corner of Douglas Avenue and North Stover Street. He saw a man in a white T-shirt and black shorts jumping fences but could not follow him.

Officer Ferreira and Sergeant Epp searched a residence on North Stover after receiving permission from the occupants. They went through every room except one bedroom where the door was locked. They did not find anything, checked the backyard, and then went to another house.

**Officer Collins Finds Defendant in the Closet**

After Officer Ferreira searched another property, he returned to the backyard of the house he had just searched with Sergeant Epp on North Stover. He looked through the windows of the house and discovered the bedroom door that had been locked when he

5.

initially searched the house was now open. Ferreira told Officer Collins that they should go back into the house and search that room.

Officer Ferreira went into the bedroom that had been locked and did not find anything. Officer Collins and Ferreira checked another bedroom, where the drapes were closed, and it was dark. Ferreira did not find anyone and walked into the hallway.

Officer Collins remained in that bedroom. He was holding his service weapon in his hand. He opened the closet door and it was full of clothes and other items. He moved some of the clothes around and realized he was looking at a person's shoulder.

**Defendant Shoots Officers Collins and Ferreira**

Officer Collins testified that someone was hiding in the closet. He stepped back, identified himself as a police officer, and ordered whoever was in the closet to show his hands. No one responded. Collins placed his service weapon in his holster because he planned to use his hands to arrest the person in the closet.

As Officer Collins reached into the closet, he heard a loud bang and felt a sharp pain. The man in the closet, later identified as defendant, shot Collins under his right shoulder.

Officer Ferreira heard Officer Collins order someone to show his hands. He ran back to the bedroom and saw the muzzle flash when Collins was shot.

Officer Ferreira testified that he next saw the muzzle of the gun "[p]rotruding through the clothes toward the bottom of the closet" and saw another muzzle flash. Defendant was still in the closet and shot Ferreira in the left shoulder. Officer Collins testified he saw the muzzle flash when Ferreira was shot.

After he was shot, Officer Ferreira stumbled out of the bedroom because he thought the gunman was tracking him. Ferreira went into the adjacent bedroom, closed the door, and waited for the gunman to follow him.

Officer Collins backed away from the closet, but defendant fired another shot, and Collins was hit in the upper left arm.

6.

Officer Collins tried to reach for his service weapon, but his arm was injured. Defendant fired another shot from the closet that hit Collins in the center of his chest. Collins was wearing a bulletproof vest, and it stopped the bullet from entering his body.

Officer Collins testified he could not see the gunman or his weapon in the closet, and just saw "a dark mass coming out at me." Collins realized that he had to reach for his gun or the gunman was going to kill him. He managed to pull his service weapon and returned fire into the closet.

As Officer Collins raised his arm to fire, defendant fired another shot and hit Collins a fourth time; the bullet entered under Collins's armpit and went into his back.

Officer Collins kept firing into the closet. He heard screaming and believed he hit the gunman. Collins backed out of the bedroom as he returned fire.

**Apprehension of Defendant**

The other officers rushed into the house when they heard the gunshots. Sergeant Brown and other officers took position in the hallway. Brown testified the suspect, later identified as defendant, emerged from the closet and appeared to be scooting out of the bedroom door. The suspect tried to get into the hallway. Brown fired 13 shots until his weapon was empty. The suspect was hit, spun around, and fell.

Officer Ferreira came back into the bedroom and found defendant lying on his back. Defendant was bleeding and moaning in pain. A revolver was on the floor. Ferreira placed defendant in handcuffs. Ferreira testified defendant was wearing the same clothing as the man who had been jumping fences.

The officers moved defendant from the house to the sidewalk. The paramedics arrived and treated defendant for gunshot wounds, and he was taken to the hospital.

Defendant had been shot multiple times and was wounded in his left eye, left knee, just below the pelvis, right thigh, left forearm, and right forearm.

**The Officers' Injuries**

Officers Collins was shot four times. He was in the hospital for two or three days, and unable to return to work for eight months.

Officer Ferreira was shot once and did not return to work for two months.

**Evidence Recovered in the Area**

Defendant's weapon was found on the bedroom floor. It was a .357-caliber Magnum Ruger Blackhawk revolver. It contained six expended shell casings.

The police searched the garage at the house on North Stover, where the resident had seen the man with a gun. They found a glass smoking pipe and other items that appeared to have been dumped in the garage and did not belong to the resident.

The officers searched defendant's clothing that the paramedics cut off his body and left on the street when they treated him at the scene of the shooting. Defendant had been wearing black and white cargo shorts. The pockets contained a bindle with a white crystalline substance consistent with methamphetamine, keys, a wallet containing $191, a California identification card, and a debit card in the name of Andrea Perez (later identified as defendant's wife).

A damaged cell phone was in the front left pocket of defendant's shorts. The cell phone had apparently been in his pocket and was hit and damaged by a projectile from a bullet. Defendant's clothing included white boxer shorts with shamrocks, a red bandana, a white sock, and a red belt with a buckle. The buckle had the letter "A" cut into the buckle.

**Defendant's Tattoos**

An officer took photographs of defendant's tattoos at the hospital. There was "XIV" under the ring finger of his left hand; the letter "S" on his face, above his right eyebrow; and "familia" on his right cheek. The letter "K" was on the left side of his face, above the left eyebrow. There were four dots to the left side of his left eye.

Defendant had the letter "S" tattooed on his neck; a Raider shield was under the "S" and appeared to black out and cover another tattoo. "Familia" was on his face; "Luis" was below his neck with the letter "S" crossed out. "RIP Anastasia" was on the left side of his neck; "Noah" was on the left side of his neck with red shading; and "XIV" was on the back of his head.

Officer Collins testified defendant had a closely-shaved head that showed tattoos; they were hidden by his hair length at the time of trial.

**Marquez's Clothing and Tattoos**

Detective Ford took photographs of Marquez on the day of the shooting. Marquez was wearing red Nike Air Jordan shoes. A red bandana with solid creases on the top and bottom was neatly folded in his left pocket. He was wearing red boxer shorts. His long hair was in a "Mongolian" tail that was common among Norteño gang members.

Marquez had "very prominent[]" tattoos of the letter "N" on the right side of his face and the letter "S" on the left side of his face; the letters "SK" underneath his chin; and four dots on the left side of his face. Ford testified the letters "SK" were significant for Norteños.

Marquez had tattoos of the letters "G" and "ST" on his right arm. Detective Ford testified the letters represented Giddings Street, an area claimed by Norteños in Visalia. On the web portion of his left hand, there were four dots, "666" and a star. The letters "CA" were on the inside of his left arm and meant California, and there were four dots above it. The words "can't" and "stop" were on the left and right front sides of his chest. "Visalia" was across his stomach. His name, "Marquez," was tattooed in red. The letters "T" and "C" were, respectively, on the inner portions of his left and right arms, so they could be seen from behind when he was walking away.[3]

---

[3] There is no evidence that Marquez was found in possession of a firearm or any contraband. Marquez was not charged with defendant, and he did not testify at defendant's trial.

**Defendant's Wife**

Andrea Perez Aviles testified she had lived with defendant and was later married to him. By 2013, they no longer lived together, but defendant still came around because she was expecting his child.

Ms. Aviles testified defendant had been a Norteño "[a]t one point in his life," and he belonged to the "East Side Delano" set. Ms. Aviles testified their last name was spelled with an "S", but defendant always spelled it "with a Z just throughout his life." Ms. Aviles knew Norteños did not like to use the letter "S," and she assumed it was because it stood for "Sureño." Ms. Aviles testified defendant hung around with people who claimed to be Norteño gang members, and she could tell they were Norteños based on the way they talked and used terms such as "scrap."

Ms. Aviles testified defendant was supposed to turn himself in two years prior to the shooting in this case. Defendant said he that he had been "on the run" for two years, and "he just always told me he wasn't gonna go back" to jail. Defendant never said that he would use violence to prevent that from happening.

Defendant told her that he was treated for depression and received medication when he was in the Youth Authority. He later went for mental health treatment but never followed up.

Ms. Aviles testified that about two days prior to the shooting, she argued with defendant because he did not have a job, and he was jealous of the father of her older child. Defendant said that he did not want to live and was going to commit suicide if they separated or she left him. Ms. Aviles moved out.[4]

---

[4] Ms. Aviles was interviewed by an officer on the night of the shooting, and the officer testified that she never said defendant had threatened to kill himself a few days earlier.

Ms. Aviles admitted that she visited defendant in jail in June 2014. By the time of trial, she had filed for divorce, moved for defendant not to have any visitation with their child, and intended to sever all ties to him.

**THE PROSECUTION'S GANG EVIDENCE**[*]

**Gang Evidence[5]**

Officer Alfano testified that when he initially saw the two men run out of the car that stopped in the residential driveway, "they had a look of being gang members of having gang affiliation" by their tattoos and "what they were wearing," which was the "baggy dress style, loose clothing, a lot of times to conceal weapons and drugs."

Officer Alfano felt the incident was gang-related when it began because of "the totality of the circumstances. It was the fact that one of them ran from us and hopped a fence. The other one [Marquez] had gang-related tattoos upon me contacting that individual, and the baggy clothing and … just it felt gang related to me…. It felt gang related from my experience in my five years in the gang unit and even my experiences prior to that working patrol." Alfano conceded that if he was testifying as a gang expert in the case, he would need more evidence than "just baggy clothing or just tattoos" to reach an opinion of whether or not defendant and Marquez were gang members.

Officers Collins testified he had two to three prior contacts with defendant involving an arrest for domestic violence and a field interview. Collins never had any problems with defendant, and defendant had never been aggressive toward law enforcement.

---

[*] See footnote, *ante*, page 1.

[5] The information alleged gang enhancements (§ 186.22, subd. (b)) for all three counts. The jury found the gang enhancement was true for count 3, possession of a firearm by a felon, but found the gang enhancements were not true for counts 1 and 2, the attempted premeditated murders of Officers Collins and Ferreira.

As we will discuss in parts I and II, defendant contends there is insufficient evidence to support the gang enhancement for count 3.

11.

## The Gang Stipulations

Just before the prosecution's gang expert testified, the court advised the jury that the parties had entered into two stipulations.

The first stipulation was that the "Norteños are a criminal street gang within the definition of … section 186.22."[6]

The second stipulation was that the shorts that were cut off from defendant and left on the street by the paramedics had "an elastic type band and no belt loops."[7]

## The Prosecution's Gang Expert[8]

Visalia Police Officer Logan, a member of the Gang Suppression Unit, testified as the prosecution's expert on criminal street gangs.

---

[6] In part I, we will address defendant's contention that this stipulation was insufficient to support the gang enhancement found true for count 3, felon in possession of a firearm.

[7] This stipulation was relevant to defense counsel's claim that the red belt and the buckle with the "A," found in the pile of clothing on the street where defendant was treated by the paramedics, did not belong to defendant because he was wearing cargo shorts that did not have belt loops.

[8] Prior to the testimony from the gang expert, defense counsel argued the prosecution could only ask hypothetical questions based on the evidence and did not address the ultimate disputed questions.

The prosecutor replied the expert's testimony would be based on the evidence. The prosecutor also stated that he would ask the expert "how would the attempting to murder a police officer benefit a Norteño criminal street gang in any fashion? [¶] I'm not asking about how this particular crime benefits – this particular type of crime benefits the gang. That's what I'm asking. I'm not asking if this one does but this particular type of crime."

The court stated the question had to be in the form of a hypothetical "or you could just ask generically … not about this particular case, but if someone were to kill a police officer," then how would it benefit their gang. The prosecutor said he would do that.

Defense counsel objected to any evidence about whether Philip Marquez was a gang member. The court overruled the objection and held the evidence was relevant on the question of whether defendant acted "in association with" another gang member.

12.

Officer Logan testified the police department used 10 validation points to determine if someone was a gang member. The validation points were if the person admitted gang membership, admitted membership while in a custodial facility, involved in a gang-related crime, named by a reliable source, writes or found in possession of gang material, identified in or corresponds with gang members; wore gang clothing or attire, and had gang associated tattoos.

The common tattoos for Norteños were "one dot on the right arm, elbow, wrist, hand and then four dots on the other side, X4, the number 14, the letter N, the word Norte." The number 14 represented the 14th letter of the alphabet, which was the letter N that represented Nuestra Familia, the northern prison gang. "X4" or "XIV" stood for the roman numeral version of "14."

Officer Logan testified the color red and red clothing and apparel were also associated with Norteños, including Nebraska hats with the letter "N," and Cincinnati Reds hats with the letter "C." The letter "C" stood for "catorce" which meant "14" in Spanish. A Norteño gang member would carry a red bandana to actively identify himself as a Norteño "so that other Norteños, if they're in a different city, different neighborhood, then they can be readily identified by their friends in that city as being Norteño gang members or to identify themselves to rivals as being Norteño gang members."

Over the prior 10 to 15 years, active Norteño members have not obtained visible gang tattoos or displayed red bandanas to be more discreet when committing predetermined crimes and prevent the police from documenting them as active gang members. They may still keep a red bandana inside a pocket.

The Sureño gang was the "number one enemy" of the Norteños. Law enforcement officers are also considered enemies of the Norteños.

---

As we will explain below, however, the jury instruction on the gang enhancement only defined the "benefit" element of the enhancement and excluded the "in association with" aspect.

13.

Officer Logan testified the officers in this case were shot in the "Holiday Homes" area of northeast Visalia. "It is predominately frequented by Norteño gang members. More specifically, it's considered North Side Visa Boys territory. This is a section of the town that is dominantly controlled and where a lot of North Side Visa Boys grew up." There were two residences in the area occupied by people who were members of Sureño gangs known as BTL and Vicky's Town. As a result, other residents of the area who were not in the gangs had been caught in the crossfire of shootings between rival gang members.

Officer Logan testified that no matter what gang a person was in, a member who shoots at a police officer will raise his own status and the status of his gang.

> "It shows that you're willing to use violence to uphold not only your own reputation, but the reputation of your … gang. [¶] Shooting at a cop is the most heinous crime that a gang member can commit, and that's gonna [*sic*] boost the reputation of that gang as being violence. [¶] Violence – respect in the gang is obtained by violence. Dominance is obtained by violence. So the more violent they are, the more that you believe and rivals perceive them to be, the more respect they're gonna [*sic*] get."

The gang member who shoots an officer will raise his own status "tremendously" within the gang and "allows them to hold positions of power by elevating their status. They have shown they are willing to commit the most heinous of acts for their gang. This, in turn, later allows them to hold a position of power, give directives."

Officer Logan testified about members of different gangs being together:

> "Q. And what is the relevance of gang members hanging out with other gang members?

> "A. Back in the day, there used to be a lot of red on red violence, gang members from one neighborhood fighting with gang members from a different neighborhood. [¶] Now, it's more organized so now you have association within the neighborhoods where they'll go and commit crimes together."

Officer Logan testified that an active gang member would not associate with someone if he knew or believed the other person was a dropout. Active members refer to dropouts as "trash" and will not commit crimes with them. A Norteño dropout would not want to advertise or openly display their gang tattoos or red colors because active Norteños would take action on that person.

**The Gang Expert's Testimony About Defendant**

Officer Logan testified about several contacts between defendant and the Visalia Police Department. On March 10, 2010, officers responded to the Blitz bar on a disturbance call about a person brandishing a weapon. Defendant was apprehended after he ran from a car. Defendant was wearing red boxers. Graciano Trevino, an active Norteño gang member, was in the car, and a loaded .380-caliber handgun was in the vehicle.

On March 18, 2010, officers conducted a field interview with defendant, who was carrying a red cell phone. Defendant was not arrested that day. Officer Logan testified that defendant "admitted to being an East Side Delano Norteño gang member." Defendant said that if he was going to be incarcerated, "he would still be housed with active gang members."

Officer Logan testified that on April 12, 2013, an officer conducted a field interview with defendant. Defendant admitted gang membership, that he associated with gang members, and he had gang-associated tattoos.

Officer Logan testified that on August 2, 2010, Officer Alfano contacted and arrested defendant for possession of methamphetamine. Defendant admitted to being "an active East Side Delano Norteño gang member," and he had the letters "SK" tattooed on his neck. Defendant said the tattoo "stood for scrap killer," and scrap was a derogatory term for a Sureño gang member.

Officer Logan testified that in his opinion, defendant was "an active Norteño gang member" at the time of the shootings in this case, and that he "was functioning as an active Norteño gang member in Visalia."

**The Gang Expert's Testimony About Marquez**

Officer Logan also testified about Philip Marquez, who was the passenger in defendant's car and was arrested immediately after he exited the vehicle. Logan testified Marquez had several gang tattoos that showed he identified himself as a Norteño.

Officer Logan testified that on August 26, 2009, a deputy from the Tulare County Sheriff's Department arrested Phillip Marquez for battery with a gang enhancement. Marquez admitted to "being an active North Side Visa, NSV gang member and that he also associated with gang members during the time of the incident."

On January 3, 2010, Marquez was interviewed by the sheriff's department as a witness to a petty theft investigation. Marquez was with Ryan Lopez and Geronimo Hernandez. Lopez was known as "Grinch" and an active MGB, "which is Mexican Gang Bangers, Norteño gang member," and Hernandez was also an active Norteño member.

On March 17, 2010, Officer Pena contacted Marquez during a traffic stop. Marquez said he "backs up north and that he has also fought in order to back up the north in the past," and that he would be housed with active Northerners if he was taken to juvenile hall.

On May 26, 2010, Marquez was contacted during a curfew violation. He was with five men: Miguel Calderon, Joseph Marquez, Jesus Hernandez, Oscar Martinez, and Rudy Dominguez, "all of which are active Northerners" in Visalia. Hernandez was an active North Side Visa Youngster and Martinez was in the Northside Visa Boys.

On September 12, 2010, Marquez was contacted by an officer during a traffic stop. Marquez was wearing gang clothing and said he "affiliates" with Norteños.

16.

**Additional Stipulations**

The court advised the jury about two additional stipulations. The parties stipulated to the admission of a Department of Justice laboratory report with an analysis of all of the firearms that were fired, and shell casings and projectiles recovered from the shooting scene.

The parties also stipulated that defendant was convicted on December 1, 2010, in case number VCF243623 for a felony violation of Health and Safety Code section 11377, subdivision (a).[9]

## DEFENSE EVIDENCE[*]

Detective Sanchez, the lead investigator, was called as a defense witness and testified there was no evidence defendant made any gang signs or uttered any gang slurs during the course of this case.

Sanchez testified that, at the time of trial, defendant was in custody. There were three possible classifications for housing: Norteños, Sureños, and "keep separates." Defendant was housed with prisoners who are kept separate from others. The group consisted of sex offenders, gang dropouts, those at risk from being with other people, and a new and separate gang made up of dropout gang members.

Detective Sanchez testified it was common after gang members were arrested for committing crimes, that they learn about the gang enhancements and try to disassociate themselves with their gangs afterwards.

**Cross-examination**

On cross-examination, the prosecutor asked Detective Sanchez for his opinion about various gang issues; the court found Sanchez qualified to testify as an expert.

---

[9] In part III, *post*, we will address defendant's contentions that his attorney never entered into a valid stipulation on this matter, and whether this stipulation was sufficient to prove an element of count 3, felon in possession of a firearm.

[*] See footnote, *ante*, page 1.

Sanchez testified that based on his experience, it was not common for gang members who kill or attempt to kill police officers to yell out gang slurs before committing the crimes. Sanchez testified that gang members usually yell out gang slurs when committing crimes against rival gang members.

**Defendant's Trial Testimony**

Defendant testified on his own behalf.[10] Defendant admitted he had a history of selling drugs and had been incarcerated before.

Defendant had previously received treatment for depression about five or six years earlier, when he was in the Youth Authority. After he was released from the Youth Authority, he was supposed to receive treatment at the mental health clinic but failed to keep up with the schedule.

Defendant had three children who had been removed from his custody and adopted, and that was part of the reason for his depression.

Defendant testified that he had attempted suicide four times. In 2010, he cut himself, so he could bleed to death. On a second occasion, he took some codeine pills. On a third occasion, he took about 100 codeine pills and was hospitalized.

Defendant testified that his fourth suicide attempt occurred in this case because he was trying to commit "suicide by cop." About two days before this incident, his wife left him. She was pregnant with his child and said she was taking his child away from him. Defendant told her that he would find a way to get himself killed.

Defendant testified that he was driving the car when he saw the officers "roll up" on him. When he saw the officers, he decided that he wanted to have them kill him. He was "tweaked out." He pulled into a driveway and got out of the car. Defendant did not have a gun with him. Defendant remembered that he ran from house to house. He was hiding, "trying to figure out how to do it," and looking for a weapon.

---

[10] Defendant said his last name was spelled "Avilez."

Defendant knew there was an outstanding warrant for his arrest, with a remand date to report to jail to serve time for a prior offense.

Defendant testified that he could not remember where he found the gun. "[Y]ou heard what the detective said. He said that's a place of crime, and I searched and I found one." Defendant remembered being in the bedroom closet. He was "blowing up on my wife on the phone, kept on calling her, texting her, trying to see … if I can stop myself before anything." Defendant pointed the gun at himself because he was "thinking about trying to do it myself," but he did not have the nerve to pull the trigger.

Defendant could not see clearly from the closet, but heard someone walk in. He heard the radio and knew the police officers were there. Defendant heard them tell him to come out and saw someone move the clothes. He thought the officers would kill him since "the gun was in my face." Defendant went blank and did not remember pulling the trigger, aiming at the police, or shooting the officers. Defendant did not remember getting shot.

Defendant remembered backing out of the closet and bedroom, and he still held the gun. "I pushed my way out [of] the room and they shot me again" when he was outside the closet. Defendant never intended to hurt an officer and did not realize they had been shot.

Defendant remembered that he was dragged out of the room and became unconscious. When he woke up, he was upset because he was still alive.

Defendant was shot eight times and received medical treatment for his bullet wounds in the arms, legs, knee cap, and pelvis. He also received treatment and medication for depression and anxiety.

Defendant testified that after he was arrested for the shootings, he was placed in protective custody at the jail because he had already decided to stop gangbanging in 2011, prior to this incident.

19.

Defendant testified that when he was in custody, he wrote a Christian believer testimony about his life and experience. He described that he had contemplated suicide, and that as the bullets were piercing his body, he was in a sort of ecstasy because he had finally succeeded at something. He wrote the testimony to help others and show that he made a mistake. He sent it to a Christian magazine, which published the story in 2014.

At the time of trial, defendant was in the "hole" for "allegedly" cutting his cellmate. He denied that he cut his cellmate with a homemade weapon. Defendant admitted that during a telephone call from the jail, he told a woman that he was in the hole for stabbing his cellmate. Defendant said he was "faded" when it happened, which meant he was drinking. Defendant testified that when he made these statements to the woman, he was not admitting that he stabbed his cellmate but just explaining why he was in the hole.

**Defense Expert[11]**

Dr. Yosef Geshuri, an attorney and a psychologist, testified as a defense expert. On May 23, 2014, Dr. Geshuri interviewed defendant, administered standardized tests, and assessed defendant for psychological and mental deficiency issues. Defendant told Dr. Geshuri that he had been "thrown into the streets" very early in life, he started a pattern of criminal behavior from a young age, and he had been dealing drugs for some years.

Dr. Geshuri testified there were different grades of "mental retardation," from moderate to mild; then severe; and profound as the highest level.[12] A normal average IQ

---

[11] In part IV, *post*, we will address defendant's argument that the court abused its discretion at the sentencing hearing because it purportedly ignored the defense evidence about defendant's alleged intellectual disability when it imposed sentence in this case.

[12] At trial and on appeal, the parties and witnesses used the term "mentally retarded," but "in accordance with current law and usage, this opinion uses the term 'intellectually disabled' except when quoting. [Citations.]" (*People v. Townsel* (2016) 63 Cal.4th 25, 33, fn. 1.)

would be 100. Defendant's test results showed his IQ was around 60 or 61, which is rated to be "in the middle mental retardation range." A cognitive ability test showed defendant's overall age equivalent was about nine and a half years old. His vocabulary was at the level of an eight-year-old. The tests showed defendant had long and short term memory problems. His overall memory quotient was 59, where the average would be 100, which was the "[m]ild or even moderate level of retardation."

Dr. Geshuri administered "a brief screening for malingering," and determined defendant was "[n]ot likely to be malingering." On cross-examination, Dr. Geshuri conceded defendant said he did not know the meaning of certain words during the testing process, and his failure to respond to the questions could raise the issue of whether he was malingering.

Dr. Geshuri testified that defendant had personality and emotional issues, severe depression, anxiety, and the thought processes of a 10-year-old child. It was not unusual for such a person to have suicidal ideations or to have attempted suicide.

Defense counsel asked Dr. Geshuri to respond to the following hypothetical:

"Q. You have a person who has mild retardation, severe depression, anxiety, thought disorder, who has attempted to commit suicide on many different occasions. What is the likelihood that they could form the intent to kill under any given situation?

"A. Generally speaking, people who are in that level of diminished ability, both in terms of cognitively and emotionally, think more about killing themselves than killing others."

Dr. Geshuri conceded that someone with "mild mental retardation" could come up with the idea of killing someone, it would be something within the realm of that person's thought processes, and that person would be able to act on those thoughts.

On cross-examination, Dr. Geshuri testified that defendant said he wanted to die and did not have the nerve to pull the trigger when he was in the closet. The prosecutor asked additional hypothetical questions:

"Q.     If someone shot an officer four times from within a few feet, including a bullet that hit them right just left of the center of [the] chest … [¶] isn't that an action that gives a suggestion of what the person is thinking when he pulled the trigger?

"A.     It's an action, but it doesn't necessarily say what a person is thinking.  [¶] … [¶]

"Q.     Well, if the person shot the only other officer in the room, as well, does that not leave you with a thought that perhaps the person was shooting the officer so he wouldn't get arrested; is that not a possibility in your mind?

"A.     It's a possibility.  [¶] … [¶]

"Q.     Okay.  So you have somebody who's running on warrants, who's saying I don't want to go to jail, it just doesn't cross your mind that when they shoot two police officers that they're doing that to avoid going to jail?

"A.     It's a possibility, but also [a] possibility that they really wanted to end it all right there and then.

"Q.     How do you end it all when you kill the two people who have guns? …. [¶]  Two [officers] in the room … and you shoot both of 'em, where's the whole suicide by cop thing?

"A.     That's what he reported to me, and that's what I reported.  I cannot say things that are not – that are speculated."

On further cross-examination, the prosecutor asked Dr. Geshuri about defendant's ability to make a false claim:

"Q.     Are you saying that the defendant is so mentally retarded that he could not come up with a claim that he was trying to commit suicide falsely after being arrested?

"A.     I'm not saying that."

Deputy Robert Sarrae was assigned to the jail where defendant was held in custody after his arrest in this case. On April 14, 2015, he received a note from defendant's cellmate that led to an investigation. It was discovered that defendant's cellmate had two small, superficial lacerations, on his wrist and his chest area, which resulted in light bleeding.

On April 26, 2015, defendant made a call from jail to a woman. A deputy monitored the call and testified defendant told the woman that he was in the " 'hole.' " The woman asked why. Defendant said, " 'I stabbed my cellie' " because defendant was " 'faded,' " which meant that he was either drunk or under the influence of a controlled substance. Defendant did not sound upset or bothered about the situation.[13]

## PROCEDURAL HISTORY[*]

### The Information

Defendant was charged with counts 1 and 2, the attempted premeditated murders of Officers Collins and Ferreira, knowing that the victims were peace officers; and count 3, felon in possession of a firearm.

As to counts 1 and 2, it was alleged defendant personally used a firearm (§ 12022.53, subd. (b)); personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and personally and intentionally discharged a firearm that proximately caused great bodily injury or death to Officers Collins and Ferreira (§ 12022.53, subd. (d)).

---

[*] See footnote, *ante*, page 1.

[13] Based on defendant's act of stabbing his cellmate, he was charged in case No. VCF321552 with count 1, assault with a deadly weapon, a cutting instrument, and by means of force likely to produce great bodily injury on the victim (§ 245, subd. (a)(1)), and that he personally used a dangerous and deadly weapon so that the offense was a serious felony (§ 969, subd. (f)). On May 3, 2016, defendant pleaded guilty and admitted the allegation for an indicated consecutive sentence of two years.

[*] See footnote, *ante*, page 1.

Also, as to counts 1 and 2, it was further alleged the offenses were committed for the benefit of a criminal street gang and were punishable by life in prison (§ 186.22, subd. (b)(5)).

A gang enhancement was separately alleged for count 3 (§ 186.22, subd. (b)(1)(A)).[14]

**Convictions and Sentence**

On July 28, 2015, after a jury trial, defendant was convicted of all three counts.

The jury found the gang allegations were not true for counts 1 and 2, attempted premeditated murder of the two officers, but that the allegation was true for count 3, felon in possession of a firearm.

The jury found true the allegations pursuant to section 12022.53, subdivision (d), that defendant personally and intentionally discharged a firearm causing great bodily injury to the victims.[15]

The court sentenced defendant to 15 years to life for count 1, attempted premeditated murder, plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement; plus consecutive terms of 15 years to life for count 2, attempted premeditated murder, and 25 years to life for the firearm enhancement, for an aggregate term of 80 years to life; plus a consecutive term of two years for his plea to assaulting his cellmate. The court stayed the terms imposed for count 3 and the attached gang enhancement.

---

[14] The information also alleged defendant had one prior strike conviction. Prior to trial, the court granted the People's motion to dismiss the prior strike allegation.

[15] In part V, *post*, we will explain that the matter must be remanded to correct the record as to the jury's findings on the firearm enhancements.

## DISCUSSION

**I.      Evidentiary Connection Between the Norteño Gang and Defendant's Claimed Membership in the East Side Delano Norteños**[*]

Defendant was charged and convicted in counts 1 and 2 with the attempted premeditated murders of the two officers.  While gang enhancements were alleged for each count, the jury found the enhancements were not true for the attempted murder convictions.

Defendant was separately charged and convicted in count 3 with being a felon in possession of a firearm.  The jury found the attached gang enhancement true for that count.  The court stayed the terms imposed for count 3 and the gang enhancement.

On appeal, defendant raises several arguments that the section 186.22, subdivision (b)(1) gang enhancement for count 3 must be reversed for insufficient evidence as a matter of law.

First, defendant notes that the prosecution's gang expert exclusively testified about the Norteño gang in general, the parties stipulated the Norteños were a criminal street gang, and the expert concluded that defendant was a member of the Norteño gang. Defendant argues the evidence showed he had repeatedly admitted he was a member of the East Side Delano Norteños, but the expert never testified about the East Side Delano Norteños.  Defendant contends that in the absence of such testimony, the People failed to show an organizational or associative connection between the East Side Delano Norteño set and the larger Norteño gang, as required by *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*).

Defendant next argues that even if the People's evidence linked defendant's set to the larger Norteño gang, there is insufficient evidence of both the "gang-related" and

---

[*] See footnote, *ante*, page 1.

"specific intent" elements required by section 186.22, subdivision (b)(1) to support the gang enhancement.

In this section, we will address defendant's argument that the People failed to show a connection between the Norteño gang and defendant's membership in the East Side Delano Norteño set. We will address the "gang-related" and "specific intent" elements in part II, *post*.

### A. Section 186.22

We begin with the underlying elements of the gang enhancement. Section 186.22, subdivision (b)(1), enacted as part of the Street Terrorism Enforcement and Prevention Act (the STEP Act) provides in pertinent part: "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony" be "punished by an additional term of two, three, or four years at the court's discretion." (§ 186.22, subds. (b)(1), (b)(1)(A).)

Section 182.22 defines a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" certain enumerated offenses, "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

A " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [specified] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on

26.

separate occasions, or by two or more persons ….'" (§ 186.22, subd. (e); *People v. Loeun* (1997) 17 Cal.4th 1, 8.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).)

" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.]' [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) " '[A] hypothetical question must be rooted in facts shown by the evidence ….' [Citation.]" (*Ibid.*) " '[T]he expert's opinion may not be based on "assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors." ' [Citations.]" (*Id.* at p. 1046.)

### *B.* **Prunty**

In *Prunty*, *supra*, 62 Cal.4th 59, the court granted review to address the showing "prosecutors must make when attempting to show that 'multiple subsets of the Norteños may be treated as a whole' under section 186.22(f)" (*id.* at p. 71, fn. 2), and "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Id.* at p. 67.)

*Prunty* held that the STEP Act requires the prosecution "to introduce evidence showing an associational or organizational connection that unites members of a putative

criminal street gang.  The prosecution has significant discretion in how it proves this associational or organizational connection to exist;…  But when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Prunty*, *supra*, 62 Cal.4th at pp. 67–68.)

> "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets.  That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group.  Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together.  And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization.

> "Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f) – i.e., that the group committed the predicate offenses and engaged in criminal primary activities – and that the defendant sought to benefit under section 186.22(b).  But it is not enough … that the group simply shares a common name, common identifying symbols, and a common enemy.  Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group." (*Id*. at pp. 71–72, fns. omitted.)

*Prunty* held the prosecution's evidence must "permit the jury to infer that the 'gang' that the defendant sought to benefit, and the 'gang' that the prosecution proves to exist, are one and the same." (*Prunty, supra*, 62 Cal.4th at p. 75.)

> "[T]he prosecution need not demonstrate the precise scope of an alleged gang, *but it must allow the jury to reasonably infer that the 'criminal street gang' the defendant sought to benefit – or which directed or associated*

28.

*with the defendant – included the 'group' that committed the primary activities and predicate offenses.*"  (*Id*. at p. 76, italics added.)

*Prunty* offered examples of how the People could prove the necessary connection. (*Prunty*, *supra*, 62 Cal.4th at p. 77.)  Gang subsets could be linked together "as a single 'criminal street gang' if their independent activities benefit the same (presumably higher ranking) individual or group," or if "two seemingly unrelated Norteño cliques routinely act to protect the same territory or 'turf' could suggest that they are part of a larger association." (*Id*. at p. 77.)  There could also be evidence "that members of the various subsets collaborate to accomplish shared goals.  For instance, the evidence may show that members of different subsets have 'work[ed] in concert to commit a crime,' [citation], or that members have strategized, formally or informally, to carry out their activities. Ultimately, this type of evidence will permit the inference that the subsets have some sort of informal relationship…."  (*Id*. at p. 78, fn. omitted.)

> "Even evidence of more informal associations, *such as proof that members of two gang subsets 'hang out together' and 'back up each other,'* can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture.  [Citations.]  This type of evidence routinely appears in gang enhancement cases.  [Citation.]  In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang." (*Ibid.*, italics added.)

## C.      *The Stipulation and Instruction*

As set forth above, the parties stipulated that the "Norteños are a criminal street gang within the definition of … section 186.22."

The court instructed the jury with CALCRIM No. 1401, on the elements of the gang enhancement:

> "To prove this allegation, the People must prove that the defendant committed or attempted to commit the crime for the benefit of a criminal street gang; [¶] And the defendant intended to assist, further or promote criminal conduct by gang members.

29.

"A criminal street gang is any ongoing organization, association or group of three or more persons, whether formal or informal.

"*It has been stipulated that Norteños are a criminal street gang….*" (Italics added.)[16]

### D.    Analysis

The People argue *Prunty's* holding only applies when the prosecution relies on evidence of predicate offenses committed by different gang subsets to establish a pattern of criminal activity for a larger criminal street gang.  The People contend *Prunty* is not applicable to this case since the parties stipulated to the existence of the Norteños as a criminal street gang, the People were not required to prove any predicate offenses, and the prosecutor's case did not turn on the existence and conduct of one or more gang subsets to commit the predicate offenses or pattern of criminal activity to prove the existence of a criminal street gang.

The People are correct that given the nature of the stipulation, the prosecution was not required to address the additional elements required to prove the Norteños were a criminal street gang within the meaning of section 186.22, subdivision (f).  As a result of the stipulation, the prosecution was not required to prove a pattern of criminal activity based upon predicate offenses committed by members of the Norteño gang or any subsets.

Defendant argues that despite the stipulation, there was an evidentiary gap because the gang expert's testimony did not show a connection between the subsets that defendant and Marquez belonged to with the larger Norteño gang, or that their two subsets "were united with the Norteños by collaborative activities or a collective organizational structure" to infer the Norteños included the two subsets, as required by *Prunty*.

---

[16] In part II, *post*, we will address the modification of CALCRIM No. 1401 to only include the "benefit" aspect of the enhancement and omit the "in association with" language from section 186.22, subdivision (b)(1).

However, Officer Logan testified about the significance of members of different gangs being together.

"Q.    And what is the relevance of gang members hanging out with other gang members?

"A.    Back in the day, there used to be a lot of *red on red violence*, gang members from one neighborhood fighting with gang members from a different neighborhood.  [¶] *Now, it's more organized so now you have association within the neighborhoods where they'll go and commit crimes together*."  (Italics added.)

Officer Logan's general testimony on this point satisfies one of the many possibilities anticipated by *Prunty* to prove an associative connection between gangs: "*Even evidence of more informal associations, such as proof that members of two gang subsets 'hang out together' and 'back up each other,' can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture*. [Citations.]  This type of evidence routinely appears in gang enhancement cases. [Citation.]  In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang."  (*Prunty*, *supra*, 62 Cal.4th at p. 78, italics added.)

Based on this discussion in *Prunty*, Officer Logan's testimony about the significance of "red" gang members hanging out together showed how different Norteño sets were associated and acted together to commit crimes.  Logan's testimony and the parties' stipulation constitutes substantial evidence to connect defendant and Marquez to the larger Norteño gang and the stipulation reached by the parties that the Norteños were a criminal street gang within the meaning of section 186.22, subdivision (f).

## II. Evidence About the "Gang-related" and "Specific Intent" Elements[*]

Defendant next contends that even if the People's evidence showed an associative connection, as required by *Prunty*, between the Norteños and the admitted membership of defendant and Marquez in the two Norteño subsets, there was still insufficient evidence to prove the "gang-related" and "specific intent" elements of the gang enhancement attached to defendant's commission of count 3, felon in possession of a firearm, as required by section 186.22, subdivision (b)(1).

### A. The Elements of the Enhancement

As stated above, section 186.22, subdivision (b)(1) provides that an enhancement shall be imposed for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members …."

"There are two 'prongs' to the enhancement. [Citation.]" (*People v. Rios* (2013) 222 Cal.App.4th 542, 561 (*Rios*).)

#### 1. The Gang-related Prong

"First, the prosecution is required to prove that the underlying felonies were 'committed for *the benefit of, at the direction of, or in association with* any criminal street gang,' " which has been described as "the gang-related prong." (*Rios*, *supra*, 222 Cal.App.4th at pp. 561, 564, italics added.)

"There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.' [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411–412.)

---

[*] See footnote, *ante*, page 1.

A crime is not "gang related simply because the perpetrator is a gang member with a criminal history" who has committed a new offense. (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.) "The gang enhancement cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes. [Citation.]" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 663 (*Ochoa*).)

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of … a[] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" (*Albillar*, *supra*, 51 Cal.4th at p. 63.)

As a separate matter, a jury may reasonably infer "association" from membership: "[I]t is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) However, a jury could "reasonably infer the requisite association from the very fact that [a] defendant committed the charged crimes in association with fellow gang members." (*Ibid.*)

### 2. The Specific Intent Prong

"Second, there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members,' " described as "the specific intent prong." (*Rios*, *supra*, 222 Cal.App.4th at pp. 561, 564.)

Section 186.22, subdivision (b)(1) does not require evidence of the defendant's specific intent to promote, further, or assist a gang-related crime. (*Albillar*, *supra*, 51 Cal.4th at p. 67.) "The enhancement already requires proof that the defendant commit a gang-related crime in the first prong – i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang. [Citation.] There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang;* the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members.* [Citations.]" (*Ibid.*)

33.

"[W]e note as to the specific intent prong that '[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' [Citation.]" (*Rios*, *supra*, 222 Cal.App.4th at pp. 567–568.)

### 3. Crimes Committed by Single or Multiple Gang Members

As we will discuss below, a series of cases have addressed the sufficiency of the evidence to prove the "gang-related" and/or the "specific intent" prongs. The requisite evidence is further dependent on whether the underlying crime was committed by multiple gang members or a single gang member acting alone.

"Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; *People v. Miranda*, *supra*, 192 Cal.App.4th at p. 412; *People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198 [the "very fact that defendant committed the charged crimes in association with fellow gang members" supported the enhancement].)

While "[n]ot every crime committed by gang members is related to a gang" (*Albillar*, *supra*, 51 Cal.4th at p. 60), it is also true that a "gang enhancement may be applied to a lone actor." (*Rios*, *supra*, 222 Cal.App.4th at p. 564; *People v. Rodriguez* (2012) 55 Cal.4th, 1125, 1140–1141.)

"[T]he typical close case is one in which one gang member, acting alone, commits a crime." (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.) "A lone gang member who commits a felony will not go unpunished; he or she will be convicted of the underlying felony. Further, such a gang member would not be protected from having that felony enhanced by section 186.22(b)(1), which applies to 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any

34.

criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ....'  Because the gang enhancement … requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang, these requirements provide a nexus to gang activity sufficient to alleviate due process concerns.  [Citation.]"  (*People Rodriguez*, *supra*, 55 Cal.4th at pp. 1138–1139; *Rios*, *supra*, 222 Cal.App.4th at p. 562.)

### B.      The Instruction Given in this Case

In order to determine whether there is substantial evidence to support the gang-related and specific intent elements of the enhancement, it is important to review the instruction that was given in this case on the elements of the gang enhancement.

As to the gang-related prong, section 186.22, subdivision (b)(1) states the gang enhancement applies if the underlying felony was committed "for the benefit of, at the direction of, or in association with any criminal street gang."  As we will explain below, the prosecution could have relied on the theory that defendant committed the crime "in association" with another gang member – Marquez – because they were members of the same Norteño gang, they were in the car together, and defendant was already in possession of the firearm.

In this case, however, the court only instructed the jury on the "benefit" aspect, and not the "association" aspect of the enhancement.  As noted above, the court gave a modified version of CALCRIM No. 1401, that defined the elements of the gang enhancement that stated:  "To prove this allegation, the People must prove that the defendant committed or attempted to commit the crime *for the benefit of a criminal street gang*; [¶] And the defendant intended to assist, further or promote criminal conduct by gang members."  (Italics added.)

The modified instruction did not state that defendant could have committed the crime "in association with any criminal street gang," as provided in section 186.22, subdivision (b)(1), to prove the gang-related prong of the enhancement.

The People concede the jury was only instructed on the "benefit" and not the "association" aspect of the enhancement, and it was never instructed to consider whether defendant committed the crime of possessing the firearm "in association with" another gang member, Marquez.

As a result of the modified instruction, we are thus limited to determining whether there is substantial evidence of the gang-related and specific intent prongs of the enhancement based on defendant's commission, while acting alone, of the crime of being a felon in possession of a firearm.

### C.    Evidence of the Gang-related and Specific Intent Elements

As noted above, a series of cases have addressed the evidence required to prove the elements of the gang enhancement when a defendant acted alone.

In *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), this court found insufficient evidence for both the gang-related and specific intent prongs of the gang enhancement, in a case where the underlying crime was committed by one person.  A minor was stopped by police after he ran a red light on his bicycle.  He gave a false name, and the officer found a concealed knife, a bindle of methamphetamine, and a red bandana in his possession.  (*Id*. at p. 1195.)  The minor said he was attacked two days earlier and "needed the knife for protection against 'the Southerners' because they feel he supports northern street gangs."  (*Ibid*.)  The minor said he had friends in the northern gangs and listed himself as a Norteño affiliate during intake at the juvenile detention facility.  (*Ibid*.) The gang expert testified to her opinion that, based on this evidence, the minor was an active Norteño and his possession of the knife benefitted the Norteños because "it helps provide them protection should they be assaulted."  (*Id*. at pp. 1195–1196.)

*Frank S*. reversed the true finding on the gang enhancement because "the expert simply informed the judge of her belief of the minor's intent with possession of the knife, an issue reserved to the trier of fact.  She stated the knife benefits the Norteños since 'it helps provide them protection should they be assaulted by rival gang members.'

36.

However, unlike in other cases, the prosecution presented no evidence other than the expert's opinion regarding gangs in general and the expert's improper opinion on the ultimate issue to establish that possession of the weapon was 'committed for the benefit of, at the direction of, or in association with any criminal street gang ....' [Citation.] The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. In fact, the only other evidence was the minor's statement to the arresting officer that he had been jumped two days prior and needed the knife for protection. To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1199.) The court acknowledged the evidence showed the minor was affiliated with the Norteños but held that "membership alone does not prove a specific intent to use the knife to promote, further, or assist in criminal conduct by gang members. [Citation.]" (*Ibid.*)

In *People v. Garcia* (2007) 153 Cal.App.4th 1499, the court held there was sufficient evidence that the defendant, acting alone, possessed a firearm for the benefit of a gang. (*Id.* at p. 1512.) The defendant was stopped for a traffic violation and officers found an unregistered, loaded handgun on the driver's side of his truck. There was evidence that the defendant was an active gang member who had knowledge of the inner workings of the gang, he had been in the gang for many years, and he had committed enough street crimes to have gained respect within the gang. (*Id.* at pp. 1502–1504.) An expert testified that guns were "huge" within the gang and that if a gang member possessed a gun, all the other gang members would know about it and that the gang's status would benefit from a gang member's reputation for carrying a firearm. (*Id.* at p. 1506.) The expert explained guns were used to intimidate members of their own gang, as well as other gangs and described " 'possession of the gun [as] power within the gang

itself.' " (*Ibid.*)  In addition, the defendant told the police that another gang member gave the gun to him for his own protection.  (*Id.* at pp. 1509–1512; see also *People v. Margarejo* (2008) 162 Cal.App.4th 102, 105–111 [the defendant possessed gun in association with gang when he escaped from police and hid his gun with another gang member]; *Albillar*, *supra*, 51 Cal.4th at pp. 63, 68 [three gang members acted with association with each to commit forcible sexual assault].)

In *Ochoa*, *supra*, 179 Cal.App.4th 650, the defendant was a gang member and acted alone when he committed a carjacking with a shotgun.  The offense did not occur in his gang's territory.  He was convicted of carjacking and felon in possession of a firearm, with gang enhancements.  (*Id.* at pp. 653, 662.)

*Ochoa* relied on *Frank S.*, *supra*, 141 Cal.App.4th 1192 and held the evidence was insufficient to support the gang-related prong of the enhancements.  "[N]othing in the circumstances of the instant offenses sustain[s] the expert witness's inference that they were gang related."  (*Ochoa*, *supra*, 179 Cal.App.4th at pp. 661–662.)  "There was no evidence that *only* gang members committed carjackings or that a gang member could not commit a carjacking for personal benefit, rather than for the benefit of the gang.  Indeed, two of the People's witnesses testified that gang members can commit crimes on their own without benefitting the gang.  While the sergeant effectively testified that carjacking by a gang member would always be for the benefit of the gang, this ' "did nothing more than [improperly] inform the jury how [the expert] believed the case should be decided," ' without any underlying factual basis to support it.  [Citation.]"  (*Id.* at p. 662.)

> "Defendant did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses.  There was no evidence of bragging or graffiti to take credit for the crimes.  There was no testimony that the victim saw any of defendant's tattoos.  There was no evidence the crimes were committed in [defendant's] gang territory or the territory of any of its rivals.  There was no evidence that the victim of the crimes was a gang member or a ... rival.  Defendant did not tell anyone … that he had special gang permission to commit the

carjacking.  [Citation.]  Defendant was not accompanied by a fellow gang member.

"While the [expert] testified that the carjacking could benefit [the] defendant's gang in a number of ways, he had no specific evidentiary support for drawing such inferences.  Indeed, he admitted that there was no indication that defendant had used the vehicle to transport other gang members.  There was no testimony that defendant used the vehicle to transport drugs or manifested any intention to do so.  While the [expert] testified that defendant may have been motivated to commit the instant crimes in order to exact retaliation against another individual, he failed to provide any evidentiary support for this conclusion.  There was never any suggestion that the alleged victim of the brandishing charge was a rival gang member or had committed any offenses against [the] defendant or his gang.  The [expert's], as to how defendant's crimes would benefit [his gang], was based solely on speculation, not evidence." (*Id*. at pp. 662–663, fns. omitted.)

*In re Daniel C*. (2011) 195 Cal.App.4th 1350 (*Daniel C*.) held there was insufficient evidence to support the specific intent prong.  A minor entered a supermarket with two other young men.  After the minor's companions left the store, the minor took a bottle of whiskey and left without paying for it.  A store employee confronted him.  The minor raised the bottle and it inadvertently broke.  The minor hit the employee with the broken bottle.  (*Id*. at p. 1353.)  The minor fled in a truck with three other young men.  The police located the truck with the minor and his three companions.  All four of them wore clothing with an element of red in it.  (*Id*. at p. 1354.)  The minor admitted going to the store to get alcohol but said his friends did not know he intended to steal it.  One of his companions admitted they went to the store to obtain alcohol.  (*Ibid*.)  The minor was a Norteño gang affiliate, one of his friends was a gang member, and another was a gang associate.  (*Id*. at pp. 1357–1358.)

*Daniel C.* held there was insufficient evidence of the specific intent prong of the gang enhancement.  (*Daniel C*., *supra*, 195 Cal.App.4th at pp. 1357–1365.)  *Daniel C.* distinguished *Albillar* because there was no evidence the minor acted in concert with his companions when he stole the whiskey and assaulted the store employee.  The minor's

companions left the store before he stole the liquor, they did not assist him in assaulting the store employee, and there was no evidence they saw what happened after they left the store or that the store employee knew they were gang members. (*Daniel C.*, *supra*, at p. 1361.)

*Daniel C.* further held that since there was no evidence the minor's companions committed any crimes in connection with the theft of the whiskey, it could not be inferred from the circumstances of the minor's crime, standing alone, that his purpose was to promote, further, or assist criminal conduct by gang members. (*Daniel C.*, *supra*, 195 Cal.App.4th at p. 1361.) There was no evidence the minor or his friends did anything while in the store to identify themselves with a gang, other than wear clothing with red on it. No gang signs or words were used and there was no evidence anyone who witnessed the crime knew gang members were involved. (*Id.* at p. 1363.) The court found no evidence to support the gang expert's opinion that the minor and his friends "planned or executed a violent crime in concert … to enhance their respect in the community, or to instill fear" (*id.* at pp. 1363–1364) since there was no evidence they entered the store with the intent to commit a violent crime, and the juvenile court had found that "the breaking of the bottle was 'happenstance,' " and that the attack on the employee was a "spur-of-the-moment reaction" to the employee's attempt to recover the bottle. (*Id.* at p. 1363.)

In *Rios*, *supra*, 222 Cal.App.4th 542, the court found insufficient evidence of the specific intent prong. An officer conducted a traffic stop. The defendant was the sole occupant of the car and did not have a driver's license; the officers decided to impound the car. They later discovered the car was stolen. The officers conducted an inventory search of the car and found gang-related paraphernalia, and a loaded, unregistered gun wrapped in a T-shirt under the front passenger seat. (*Id.* at pp. 547–552.) The defendant was booked into custody and asked if he belonged to a gang. The defendant said he was a Norteño and "a 'Northerner associate.' " (*Id.* at pp. 549–550.) The defendant was housed in "a dormitory for active Norteño gang members and their associates" without

40.

incident. (*Ibid*.) At trial, the defendant denied that he was a gang member but said that "he 'hangs out' with Norteños because he went to school with them." (*Id*. at p. 554.) The prosecution gang expert "opined that [one of] defendant's … tattoo was gang related, but that his other tattoos were not." (*Id*. at p. 551.) In response to a hypothetical question, the gang expert testified about the value and uses of a gun to a gang member, especially an unregistered gun that "cannot be traced back to the gang member," and that "a gang member with a firearm promotes, furthers and assists felonious conduct by other gang members." (*Id*. at p. 573.) The defendant was convicted of carrying a loaded firearm in a vehicle, and taking or driving a vehicle without a permission, with gang enhancements.

*Rios* held that while "a lone actor may be subject to the gang enhancement," there was insufficient evidence to support the enhancements in that case "absent evidence that defendant acted in concert with other gang members …." (*Rios*, *supra*, 222 Cal.App.4th at p. 572.)

> "For example, the prosecution could have presented evidence that another gang member had directed defendant to steal a car to use in a robbery, or that defendant was transporting the loaded gun from one gang member to another to use in a robbery or driveby shooting. There was no such evidence. [D]efendant never admitted that he stole the car or transported the gun to promote, further, or assist in any criminal conduct by gang members." (*Id*. at pp. 572–573.)

*Rios* held "the expert testimony in response to the hypothetical in this case was insufficient to support an inference that defendant carried the gun in the vehicle with the specific intent required for the gang enhancement." (*Rios*, *supra*, 222 Cal.App.4th at p. 574.) "As in *Daniel C*., there was no evidence that any victim in this case or anyone in the local community knew defendant was a gang member, was affiliated with a gang, or was acting with a gang purpose." (*Id*. at p. 573.)

> "And like *Frank S*. and *Ochoa*, there was no evidence that defendant was in Norteño territory or rival gang territory when he stole the car; that he

called out a gang name, displayed gang signs or otherwise stated his gang affiliation; or that the victims of the car theft were rival gang members or saw his tattoos or gang clothing. Here, although there was evidence that auto thefts and illegal gun possession were among the primary activities of the Norteño gang in Salinas, that evidence alone was insufficient to support the inference that defendant stole the Chrysler and possessed the gun with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id*. at p. 574.)

"[I]n a case such as this, where the defendant acts alone, the combination of the charged offense and gang membership alone is insufficient to support an inference on the specific intent prong of the gang enhancement" because "[o]therwise, the gang enhancement would be used merely to punish gang membership." (*Rios*, *supra*, 222 Cal.App.4th at pp. 573–574.) There was "no evidence that any victim in this case or anyone in the local community knew defendant was a gang member, was affiliated with a gang, or was acting with a gang purpose." (*Id*. at p. 573; see also *People v. Perez*, *supra*, 18 Cal.App.5th at pp. 613–614 [insufficient evidence of gang-related element where gang member acted alone by firing shots at college party where no one knew his gang affiliation].)

### D.     Analysis

The People argue there was sufficient evidence to support both the gang-related and specific intent elements of the gang enhancement based on Officer Logan's testimony about the membership of defendant and Marquez in the Norteño gang, evidence that the crime occurred in the "Holiday Homes" area that was "frequented predominately by Norteños, specifically North Side Visa Boys Norteños," frequent shootings in the area since Sureños also lived in the neighborhood, and that "[s]hooting at a police officer raises your status in a gang because it demonstrates a willingness to use violence to uphold your reputation and that of our gang."

While the People acknowledge the jury was only instructed on the "benefit" and not on the "association" aspect of the gang-related prong, they argue the enhancement was supported by evidence defendant was "with a fellow self-identifying Norteño,

42.

Marquez." "The jury could infer that [defendant] possessed the gun to promote, further or assist any criminal conduct by gang members based on the nature of the violent and feuding area, his attire and tattoos at the time, the presence of his fellow Norteño, and because possessing an inherently dangerous weapon would cause [defendant] and fellow gang members to be perceived as dominating and violent – a benefit. His intentional possession of a gun with a known member of a gang was sufficient evidence of requisite specific intent."

As noted above, however, the People conceded the jury was only instructed on the "benefit" aspect of the gang-related prong and not about the "association" aspect. As a result of the instructional limitation, the jury could not find that defendant committed the offense of being a felon in possession of a firearm in association with another member of the Norteño gang. (Cf. *Albillar*, *supra*, 51 Cal.4th at pp. 63, 68; *People v. Margarejo, supra,* 162 Cal.App.4th at pp. 105–111.)

As explained in *Rios*, "a lone actor may be subject to the gang enhancement …." (*Rios*, *supra*, 222 Cal.App.4th at p. 572.) Defendant suddenly stopped the car and ran from the officers in a neighborhood known as a Norteño area. As he jumped fences, he did not call out gang slogans or make any gang signs. Instead, he sought to conceal himself within various houses and buildings to evade detection. There was no evidence that any of the residents who saw defendant jumping fences or hiding on their properties were members of the Norteño gang.

Officer Logan, the gang expert, testified generally about how shooting a police officer would raise the prestige of a gang member and his gang. Logan's testimony focused solely on how shooting an officer would promote an individual gang member and his gang, and never addressed the felon in possession charge. The jury rejected Logan's testimony about the gang-related nature of shooting the two officers because it convicted defendant of two counts of attempted premeditated murder but found the gang enhancements attached to those counts were not true. Thus, to the extent that a gang-

43.

related purpose could be inferred from the expert's opinion about defendant's possession and use of a gun, such an inference was refuted by the limitations of the expert's testimony to the crimes of attempted murder and the jury's contrary findings on the gang enhancements for those convictions.

The evidence in this case was insufficient to support the enhancement as addressed in *Frank S.*, *Ramon*, *Ochoa*, and *Daniel C.* The expert testified that shooting a police officer was gang-related but did not address the impact of a gang member carrying a firearm. There was no evidence defendant was about to commit a shooting or other crime when he stopped the car and ran away from the police. The jury could have inferred that he ran because he was in possession of the firearm and the drugs that he abandoned in the garage, but there was no evidence that either act was performed for the benefit of his gang or that the act of selling drugs benefitted that particular Norteño gang.

As for the specific intent prong, "where the defendant acts alone, the combination of the charged offense and gang membership is insufficient to support an inference on the specific intent prong of the gang enhancement" because "[o]therwise, the gang enhancement would be used merely to punish gang membership." (*Rios*, *supra*, 222 Cal.App.4th at p. 574.) As with the gang-related element, there was similarly no evidence to support an inference that defendant carried the gun with the requisite specific intent.

We are thus compelled to conclude that while defendant and Marquez may have been active members of a Norteño set, the jury was only instructed on the "benefit" aspect of the gang enhancement and not the "in association with" element. There was no evidence that defendant committed count 3 for the benefit of his gang and with the specific intent to promote, further, or assist criminal conduct by gang members.[17]

---

[17] A finding that the gang enhancement attached to count 3 is not supported by substantial evidence will not affect the sentence imposed in this case since the court stayed the terms imposed for both count 3 and the enhancement.

44.

**III.    Defendant Entered into a Valid Stipulation for Count 3**[*]

In count 3, defendant was charged with felon in possession of a firearm (§ 29800, subd. (a)(1)), having been convicted of a felony violation of Health and Safety Code section 11377, subdivision (a) on December 1, 2010, in Tulare County Superior Court case No. VCF243623.

Before the defense rested, the court advised the jury that the parties stipulated defendant was convicted on December 1, 2010, in case number VCF243623 for a felony violation of Health and Safety Code section 11377, subdivision (a).  The prosecution did not introduce any additional evidence about a prior felony conviction.  Defendant was convicted of count 3.

On appeal, defendant asserts defense counsel never entered into a valid stipulation on his prior conviction and, as a result, his conviction in count 3 must be reversed for insufficient evidence since the prosecution never introduced any evidence about a prior felony conviction.

As we will explain, there were lengthy discussions between the court, the prosecutor, and defense counsel about the four stipulations that were entered during trial. The entirety of the record shows the stipulation about defendant's prior felony conviction was valid, knowing, and intelligent.

### A.    *Stipulations*

The elements of the crime of being a felon in possession of a firearm are conviction of a felony and ownership or knowing possession, custody or control of a firearm.  (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1029, disapproved on other grounds in *People v. Frierson* (2017) 4 Cal.5th 225, 240, fn. 8; § 29800, subd. (a)(1).)

"[W]hen a defendant's prior felony conviction is an element of a charged crime: (1) The prosecution can prove the conviction in open court, and that proof can include

---

[*] See footnote, *ante*, page 1.

both the fact that the defendant has previously been convicted of a felony offense as well as the nature of the felony involved; or (2) the defendant can stipulate to having a felony conviction and thereby keep from the jury the nature of the particular felony." (*People v. Sapp* (2003) 31 Cal.4th 240, 261.)

A stipulation is a binding agreement between the parties and is a substitute for proof by evidence. (*Palmer v. City of Long Beach* (1948) 33 Cal.2d 134, 142; *Greatorex v. Board of Administration* (1979) 91 Cal.App.3d 54, 58.) "An attorney has implied authority to enter into stipulations affecting procedure in the trial, as distinguished from those which go to the cause of action itself [citations] and a defendant may not assert on appeal procedural rights which he waived at the trial. [Citations.]" (*People v. Wilson* (1947) 78 Cal.App.2d 108, 120.)

"It is, of course, well established that the defendant is bound by the stipulation or open admission of his counsel and cannot mislead the court and jury by seeming to take a position on issues and then disputing or repudiating the same on appeal [citations]." (*People v. Pijal* (1973) 33 Cal.App.3d 682, 697.) "Unless the trial court, in its discretion, permits a party to withdraw from a stipulation [citations], it is conclusive upon the parties, and the truth of the facts contained therein cannot be contradicted. [Citations.]" (*Palmer v. City of Long Beach*, *supra*, 33 Cal.2d at pp. 141–142; *People v. Banda* (2018) 26 Cal.App.5th 349, 365.)

With this background in mind, we review the record that shows defense counsel intended, and in fact did, enter into a valid stipulation for defendant about the existence of the prior felony conviction for purposes of count 3.

### B.     The Four Stipulations in this Case

During defendant's trial, the court advised the jury that the parties had entered into four stipulations:

(1) That the "Norteños are a criminal street gang within the definition of … section 186.22."

(2) The shorts that were cut off from defendant and left on the street by the paramedics had "an elastic type band and no belt loops."

(3) The parties stipulated to the admission of a Department of Justice laboratory report with an analysis of all of the firearms fired, and recovered shell casings and projectiles; and,

(4) That defendant was convicted on December 1, 2010 in case number VCF243623 for a felony violation of Health and Safety Code section 11377, subdivision (a).

### C.     The Court's Discussion About the Firearms Report Stipulation

Just before the prosecution's gang expert testified, the jury was advised about the first and second stipulations regarding the Norteños and defendant's shorts.

Toward the end of the prosecution's case, the court and the parties reviewed the exhibits outside the jury's presence and discussed whether they had been accepted into evidence.

"[THE PROSECUTOR]:    [Exhibit] 80 is the stipulated document that we haven't read the stipulation to the jury but that's the firearms report.

"[DEFENSE COUNSEL]:  Hm-hmm.

"[THE PROSECUTOR]:    So we need to read that stipulation to the jury.

"THE COURT:     So it's not received yet.

"[THE PROSECUTOR]:   *I'm asking it to be received, but we still need to read the stipulation to the jury*.

"THE COURT:     That's fine.

"[DEFENSE COUNSEL]: *We stipulated already*.

"THE COURT:     All right.  So that will be received."  (Italics added.)

Defense counsel thus concurred that he stipulated to the admission of the firearms report.

### D.    The Court's Discussion About Defendant's Prior Convictions

The information alleged that defendant's conviction for possession of a controlled substance in case No. VCF243623 was the prior felony offense for purposes of count 3.

Shortly after the parties discussed the firearms report, the prosecutor asked the court to address defendant's prior convictions outside the jury's presence.

During the course of this discussion, defense counsel moved to reduce certain felony convictions to misdemeanors pursuant to the provisions of Proposition 47, including case No. VCF243623.

"[THE PROSECUTOR]:    Then the only thing left is the court was going to take judicial notice, but we need to do it in front of the jury about the defendant's prior.

"THE COURT:      Yes, and do we have those files?  What are those file numbers again, [asking the prosecutor]?

"[THE PROSECUTOR]:    Let's see.

"THE CLERK:      [Case Nos.] PCM2543323, *VCF243623*, TCM256950 and VCM 243293—39.

"THE COURT:      Okay.  So let's see what was pled to.  So in case 254332, it looks like a DUI.

"[THE PROSECUTOR]:    The DUI wasn't one of – I only asked for three.

"THE COURT:      Okay.

"[THE PROSECUTOR]:    DUI is not one of 'em.

"THE COURT:      I was going to ask you.

"[THE PROSECUTOR]:    *No, no.  One is a felony [Health and Safety Code section] 11377 which under Prop. 47 is reducible to a misdemeanor; however, that doesn't obviate him of his firearm prohibition.*

[¶] *In addition, there are two misdemeanors that also prohibit him from having a firearm.* One is, I believe—

> "THE COURT:            Okay. So the purpose of this is not gang, it's the firearm prohibition.
>
> "[THE PROSECUTOR]:    It's the firearm, Count 3.
>
> "THE COURT:            *Okay. So [case No.] 243623 was convicted as a felony. I would agree that it is eligible to be reduced. You might want to – are you willing to have an oral petition [referring to the prosecutor]*?
>
> "[THE PROSECUTOR]:    That's fine by me.
>
> "THE COURT:            *Okay. So are you asking the court to – pursuant to [section] 1170.18 to reduce that at this time*?
>
> "[DEFENSE COUNSEL]:  *Yes, your Honor.*
>
> "THE COURT:            All right. *So based on the motion of the defense and the agreement of the People, in case 243623, at this time that will be reduced pursuant to section 1170.18*, and the fines will also be adjusted to reflect misdemeanor fines.
>
> "[DEFENSE COUNSEL]:  Credit for time served?
>
> "THE COURT:            Credit for time served."  (Italics added.)

Defense counsel thus agreed that defendant was previously convicted of a felony in case No. VCF243623, and the court granted his request to reduce that conviction to a misdemeanor under Proposition 47.

At the time of the charged offense in this case, however, defendant had been convicted of a felony in case No. VCF243623.

### E.      *Further Discussions About the Stipulation*

During a break in the defense case, the court returned to the matter of the stipulation about defendant's prior conviction for count 3, outside the jury's presence.

> "THE COURT:              … Has the stipulation come in yet that [defendant] has a felony conviction?

"[DEFENSE COUNSEL]: *We stipulated.*

"[THE PROSECUTOR]:   We stipulated.  I think the court – let's take a look at that instruction real quick, but I think the court can read that instruction, and that can be sufficient.

"THE COURT:                All right.  So you both agree that the stipulation has already taken place?

"[THE PROSECUTOR]:   Yes.

"THE COURT:                All right.

"[THE PROSECUTOR]:   *It was not done in the presence of the jury*, but that's why I said—

"THE COURT:                That's why I said it needs to.

"[THE PROSECUTOR]:   I think that if the court reads the instruction—

"THE COURT:                I think the stipulation needs to be in front on the jury.

"[THE PROSECUTOR]:   Okay.

"THE COURT:                So you're gonna want that stipulation in front of the jury in order for them to consider that.

"[THE PROSECUTOR]:   And we do have one other stipulation, and that is that the report, the Department of Justice Laboratory report, Exhibit 80, is also admitted into evidence.

"THE COURT:                Okay.

"[THE PROSECUTOR]:   I have the wording for that stipulation.

"THE COURT:                Okay."  (Italics added.)

Defense counsel did not object to the prosecutor's statements about the stipulation to the prior felony conviction.

Defense counsel's agreement to the stipulation about the prior conviction was identical to his earlier agreement to the stipulation about the firearms report.

50.

## F.    The Stipulation About the Firearms Report

After the defense rested, the prosecutor said in front of the jury, "I don't know if we want to do the stipulations now or at the end."  The court asked the prosecutor to read the stipulations to the jury.  The prosecutor read the stipulation about the firearms report, and the court asked for the next stipulation about the prior conviction.

> "THE COURT:      All right.  Is there another stipulation?
>
> "[THE PROSECUTOR]:    *I'll let counsel state the second stipulation.*
>
> "[DEFENSE COUNSEL]: *Which one are we – I don't know the case number.  I don't have it in front of me.*
>
> "[THE PROSECUTOR]:    Thought we were all ready, apologize, your Honor; I thought we already [*sic*].
>
> "THE COURT:              It's okay.
>
> "[THE PROSECUTOR]:    This stipulation we should probably reserve and pull the court's actual case number.
>
> "THE COURT:              All right.  We will do that."  (Italics added.)

The trial resumed with the prosecution's rebuttal witness.

## G.    The Stipulation About Defendant's Prior Felony Conviction

At the conclusion of the rebuttal evidence, the following statements were made in front of the jury:

> "[THE PROSECUTOR]:    The stipulation, I believe, is – that we were referring to a minute ago is that the – here; that the defendant has a felony conviction under – for purposes of Count 3 under case number VCF243623 for Health and Safety Code Section 11377(a), conviction date of December 1, 2010, out of the Tulare Superior Court.
>
> "[DEFENSE COUNSEL]:  We make note to the court that that is a crime that is – falls under the auspices of Prop. 47 which in – without exception for this charge is *reduced to a misdemeanor upon submission to the court*.

"THE COURT:                All right.  Thank you both." (Italics added.)

## H.    *The Instructions*

The jury was instructed with CALCRIM No. 2511 on the elements of count 3, possession of a firearm by a person prohibited due to conviction.

"To prove that the defendant is guilty of this crime, the People must prove that the defendant possessed a firearm; [¶] Defendant knew that he possessed the firearm; [¶] And the defendant had previously been convicted of a felony.

"A firearm is any device designed to be used as a weapon ….

"The defendant and the People have stipulated or agreed that *defendant was previously convicted of a felony*.  This stipulation means that you must accept this fact as proved."  (Italics added.)

## I.    *Analysis*

Defendant argues that his attorney never entered into a valid stipulation because he never "clearly stated he 'stipulated' that [defendant] had a felony conviction or stated that he agreed to the terms of the stipulation…."  Defendant asserts that counsel's statements at the time of the alleged stipulation – that the prior conviction could be reduced to a misdemeanor – showed that counsel never made a "clear agreement" that he had a prior felony conviction.

We first note that defendant cannot argue the stipulation was invalid because of the court's decision to grant his midtrial request to reduce his prior felony conviction for possession of a controlled substance in case No. VCF243623, to a misdemeanor pursuant to Proposition 47, or that defense counsel's addendum about Proposition 47 somehow undermined the validity of the stipulation.

Section 1170.18 allows those who have already completed their sentences for eligible felony convictions to petition to have their convictions "designated as misdemeanors."  (§ 1170.18, subd. (f).)  Section 1170.18, subdivision (k) states:  "A felony conviction that is recalled and resentenced under subdivision (b) or designated as a

52.

misdemeanor under subdivision (g) shall be considered a misdemeanor for all purposes, *except that resentencing shall not permit that person to own, possess, or have in his or her custody or control a firearm or prevent his or her conviction under Chapter 2 (commencing with Section 29800) of Division 9 of Title 4 of Part 6*." (Italics added.)

In *People v. Gilbreth* (2007) 156 Cal.App.4th 53, the defendant was convicted of being a felon in possession of a firearm. The defendant had previously been convicted of a felony, but it had been reduced to a misdemeanor under section 17, subdivision (b), prior to his commission of the charged offense of felon in possession. *Gilbreth* reversed the defendant's conviction of felon in possession because "[a]t the time [the defendant] was charged in this case, [the] defendant had a prior misdemeanor conviction … and that conviction could not be considered a felony to serve as the basis for a charge that defendant had violated section 12021." (*Id*. at p. 58; *People v. Lewis* (2008) 164 Cal.App.4th 533, 536.)

In contrast to *Gilbreth*, the record in this case shows defense counsel acknowledged defendant had a prior felony conviction when he committed the offenses in this case. The court's subsequent decision, in the midst of this trial, to reduce that felony to a misdemeanor did not undermine the stipulation to that felony as an element of count 3.

Moreover, the entirety of the court's discussions with the parties about the various stipulations shows defense counsel intentionally and properly entered into the stipulation about defendant's prior felony conviction. During the defense case, after the court had reduced the felony to a misdemeanor, the court asked the parties whether the stipulation had been introduced that defendant "has a felony conviction." Defense counsel replied, "We stipulated," using similar language to his earlier agreement to the stipulation about the firearms report. The prosecutor clarified the stipulations still needed to be read to the jury about defendant's prior felony conviction and the firearms report.

When the jury returned to the courtroom, the prosecutor read the stipulation about the firearms report. The prosecutor then turned to defense counsel to state the stipulation about the prior felony conviction. Defense counsel started to read the stipulation but realized he did not have the correct case number. The court deferred the matter. Shortly afterward, the prosecutor read the stipulation, followed by defense counsel's statement that the prior offense was reduced to a misdemeanor under Proposition 47.

Defense counsel entered into a valid stipulation and defendant's conviction in count 3 is supported by substantial evidence.

## IV. The Court Did Not Abuse Its Discretion at the Sentencing Hearing[*]

Defendant contends the court abused its discretion at the sentencing hearing because it refused to consider mitigating evidence that had been introduced at trial about defendant's alleged intellectual disability. Defendant asserts Dr. Geshuri's trial evidence about defendant's "mild mental retardation" should have been treated as a mitigating factor and the court's failure to do so requires remand for the court to reconsider whether to impose consecutive or concurrent terms for counts 1 and 2.

### A. The Probation Report

The probation report stated that the officer did not have access to the trial transcripts but summarized the shootings of the two officers based upon the police reports. The report did not address Dr. Geshuri's trial testimony and his opinions about defendant's alleged intellectual disability.

The report stated that prior to trial, defendant had been referred to two psychiatrists to determine his sanity, defendant told the experts about his drug use and suicide attempts and that he wanted to die, one expert diagnosed defendant with a moderate major depressive disorder, and both experts found defendant did not meet the criteria for a finding of not guilty by reason of insanity.

---

[*] See footnote, *ante*, page 1.

The probation report stated there were no mitigating factors. The aggravating factors were that defendant had engaged in violent conduct indicating a serious danger to society; his prior convictions as an adult were numerous; he was on probation when the crimes were committed; and his prior performances on probation and juvenile parole were unsatisfactory. The factors affecting concurrent or consecutive sentences were that the crimes were independent of each other; the crimes involved separate acts of violence; and the offenses were committed at different times and places, referring to defendant's plea in the separate case for assaulting his cellmate.

### B.      The Sentencing Hearing

The sentencing hearing was conducted by the same judge who presided over defendant's trial.

At the sentencing hearing, defense counsel objected to the probation report's finding that there were no mitigating circumstances. Counsel complained the probation officer did not read the trial transcripts and never considered Dr. Geshuri's trial testimony about defendant's "mild mental retardation" and low level of intelligence. Counsel asked the court to consider Dr. Geshuri's testimony because defendant's mental status should be treated as a mitigating factor.

The prosecutor argued there were no mitigating factors and the entirety of the evidence refuted defendant's claim that he wanted to commit suicide that day since he was driving around with a gun, he ran from the police, and he fired multiple shots at two officers.

### C.      The Court's Ruling

The court made the following findings:

"The first thing the court's gonna [*sic*] be commenting on is the issue of mitigating and aggravating factors.

"The court does not – court had the benefit of listening to the trial in this particular case and does not adopt the suggestion of mitigating factors.

55.

"The court does find, though, that there are aggravating factors… Those include that the defendant had prior convictions and – many prior convictions, many of them involving violence as an adult, and those are numerous convictions. The defendant was on probation at the time that the crime was committed, and additionally, that the defendant's prior performance on probation, as well as his Youth Authority parole, were both unsatisfactory.

"And so with that, the court is ready to proceed with the sentencing…."

The court sentenced defendant to an aggregate term of 80 years to life for counts 1 and 2, based on consecutive sentences for the attempted murder convictions and the firearm enhancements, plus a consecutive term of two years in case No. 321552, defendant's plea to assaulting his cellmate.

### D.    Atkins

Defendant argues the court abused its discretion at the sentencing hearing because it should have considered evidence of his alleged intellectual disability as a mitigating factor, based on *Atkins v. Virginia* (2002) 536 U.S. 304 (*Atkins*).

In *Atkins*, the United States Supreme Court established a categorial rule that the Eighth Amendment forbids the execution of an intellectually disabled person because "they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." (*Atkins*, *supra*, 536 U.S. at p. 306.) *Atkins* defined intellectual disability as " 'characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.' " (*Id*. at p. 308, fn. 3.)

*Atkins* also recognized that "[t]hose mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes." (*Atkins*, *supra*, 536 U.S. at p. 306; see also *People v. Boyce* (2014) 59 Cal.4th

672, 722 [*Atkins* has not been extended to "mental illness in general"]; *People v. Mendoza* (2016) 62 Cal.4th 856, 909–910.)

*Atkins* left to the states " 'the task of developing appropriate ways' " to ensure that intellectually disabled defendants are not sentenced to death. (*Atkins*, *supra*, at p. 317, fn. omitted; see also *People v. Woodruff* (2018) 5 Cal.4th 697, 777.)  As a result, section 1376 was enacted and defines " 'intellectual disability' " as " 'the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age.' [Citation.] CALCRIM No. 775 issued in response to section 1376 lists the adaptive behavior areas and instructs the fact finder [in a capital case] that it must find deficits in two or more areas.  Once a defendant submits an expert declaration on intellectual disability, the court orders a hearing to determine the issue.  [Citation.]  … The procedure for determining intellectual disability is the same whether by a pretrial court hearing or a jury trial following the guilt phase:  Each side presents evidence and has the option to present rebuttal evidence, and each side makes a closing argument.  [Citations.]" (*People v. Woodruff*, *supra*, at pp. 777–778.)

### E.     Analysis

*Atkins* has been limited to capital cases and has not been extended to other sentencing factors in noncapital cases.  Nevertheless, defendant argues the court should have treated Dr. Geshuri's trial testimony about his "mild mental retardation" as a mitigating factor at the sentencing hearing, and the matter must be remanded for the court to reconsider whether to rely on this alleged mitigating factor to impose consecutive or concurrent terms in this case.

We note that the record indicates that shortly after the complaint was filed, the court suspended proceedings and ordered an expert to examine defendant to determine whether he was competent to stand trial.  The expert determined he was competent, he showed no evidence of psychosis or cognitive impairment, and he spoke in a lucid and

linear manner. While he was in the low range of academic functioning, he showed minimal impairment on competency-related abilities.

Defendant was subsequently examined by two experts to determine whether he could enter a plea of not guilty by reason of insanity. The first expert reported in December 2013 that there was no evidence of any type psychiatric disorder, neurological symptoms, or psychosis to impair defendant's concept of reality, and no clinical evidence of bizarre, disorganized, or schizophrenic behaviors. Defendant was suffering "from a psychiatric disorder best classified as substance abuse disorder (methamphetamines)." Defendant was not legally insane at the time of the offenses, he was capable of knowing and understanding the nature and quality of his act, differentiate right from wrong, and had the capacity to form intent. The second expert reported in January 2014, that defendant did not meet the criteria for an NGI finding, he could distinguish right from wrong, and understood the nature and quality of his actions. There was no evidence of psychosis at the time of the offense. Defendant's thought process "was clear, logical, and goal-directed. There was no evidence of a formal thought disorder." "While there is evidence he was suffering from a Major Depressive Disorder, this did not result in a loss to his cognitive capacity such that he did not comprehend the criminality or wrongfulness of his behavior."

As set forth above, Dr. Geshuri testified for the defense at trial that, in his opinion, defendant's test results indicated he had "mild mental retardation." On cross-examination, Dr. Geshuri conceded defendant could have failed to answer certain test questions because he was malingering, that someone with "mild mental retardation" could intend and carry out the plan to kill someone, and defendant was not so "mentally retarded" that he could not have come up with a false claim that he wanted to kill himself.

Based on Dr. Geshuri's testimony, the jury was instructed with CALCRIM No. 3428, mental impairment as a defense to specific intent or mental state: the jury could consider evidence that defendant may have suffered from a mental disease, defect,

or disorder, only for the limited purpose of deciding whether he acted with intent or mental state required for the charged offenses; the People had the burden of proving beyond a reasonable doubt that defendant had the specific intent to kill for counts 1 and 2, attempted murder, he had knowledge the victims were acting as police officers, and/or he intentionally fired a firearm; and if the People did not meet that burden, the jury had to find defendant not guilty of attempted murder. The jury obviously rejected Dr. Geshuri's testimony about defendant's alleged intellectual disability because it found defendant guilty of the two counts of attempted premeditated murder of peace officers.

"Only a single aggravating factor is required to impose the upper term [citation], and the same is true of the choice to impose a consecutive sentence [citation]." (*People v. Osband* (1996) 13 Cal.4th 622, 729; *People v. Steele* (2000) 83 Cal.App.4th 212, 226.) "Sentencing courts have wide discretion in weighing aggravating and mitigating factors" and "a trial court may 'minimize or even entirely disregard mitigating factors without stating its reasons.' [Citation.]" (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1258.)

Contrary to defendant's arguments, the court was well aware of the defense evidence about defendant's alleged intellectual disability, and defense counsel's complaints that the probation report failed to summarize Dr. Geshuri's trial testimony and refer to that evidence as a mitigating factor. The court considered and rejected defense counsel's argument to treat the defense evidence as a mitigating factor in this case. Even if the court should have considered the defense evidence as a mitigating factor, the court still found multiple aggravating circumstances to support its discretion to impose consecutive indeterminate sentences for counts 1 and 2. We cannot say the court abused its discretion in doing so and will not remand for the court to reconsider its decision to impose consecutive sentences.

## V. The Parties' Agreement to Remand for Specific Sentencing Issues[*]

In contrast to the court's ruling on consecutive sentences, the parties agree that the matter must be remanded for a new sentencing hearing on several specific issues. Given the parties' agreement about the need for remand, we will briefly summarize these issues for the trial court to address.

### A. Credits

Defendant contends that while the court correctly awarded him 799 days of actual credits for being in custody, it erroneously failed to award him any conduct credits.

The People state that an addendum to the probation report excluded conduct credits and the court had a plausible reason for not awarding any. Nevertheless, the People concur that remand is necessary for the court to either correct its previous ruling and award conduct credits or clarify why it denied the credits.

### B. The Firearm Enhancements for Counts 1 and 2

The parties agree that on remand, the court must correct the record about the firearm enhancements.

The information alleged as to counts 1 and 2, attempted murder, that defendant personally used a firearm (§ 12022.53, subd. (b)); personally and intentionally discharged a firearm (§ 12022.53, subd. (c)); and personally and intentionally discharged a firearm that proximately caused great bodily injury or death to Officers Collins and Ferreira (§ 12022.53, subd. (d)).

As to counts 1 and 2, however, the jury was only instructed, received verdict forms, and found true the allegations pursuant to section 12022.53, subdivision (d), that defendant personally and intentionally discharged a firearm causing great bodily injury to the victims.

---

[*] See footnote, *ante*, page 1.

The jury was not instructed, did not receive verdict forms, or making findings for the section 12202.53, subdivision (b) and (c) enhancements alleged in the information for counts 1 and 2. As to the lesser offenses of attempted voluntary manslaughter for counts 1 and 2, the jury received verdict forms to determine whether defendant personally used a firearm in violation of section 12022.5, subdivision (a). The jury found defendant guilty of the greater offenses and did not fill in those forms.

In the reporter's transcript for the sentencing hearing, the court stated it was imposing the firearm enhancements for counts 1 and 2 pursuant to section 12022.53, subdivision (d), consistent with the information and the jury instructions.

However, the May 26, 2016, minute order for the sentencing hearing and the abstract of judgment state the court imposed the firearm enhancements for counts 1 and 2 pursuant to section 12022.53, subdivision (b), and that it stayed the enhancements for section 12022.53, subdivision (d).

Defendant requests and the People agree that on remand, the court must correct the minute order and abstract of judgment to show that the firearm enhancements for counts 1 and 2 were found true and the indeterminate terms were imposed pursuant to section 12022.53, subdivision (d), and that no firearm enhancements were found true or stayed under any other subdivision.[18]

### C. Count 3

Defendant was charged in count 3 with a violation of section 29800, subdivision (a)(1), felon in possession of a firearm, and the jury was correctly instructed on the offense.

---

[18] As we discuss below, the matter is also being remanded for the court to consider whether to exercise its discretion to strike any of the firearm enhancements pursuant to recent statutory amendments. The court must correct the abstract accordingly once it decides whether or not to exercise this discretion on the firearm enhancements.

The verdict form for count 3 erroneously stated that defendant was convicted of possession of a firearm by a prohibited person in violation of "section 28900(a)(1)" instead of the charged crime of section 29800, subdivision (a)(1).

The May 26, 2016, minute order for the sentencing hearing and the abstract of judgment incorrectly state that defendant was convicted in count 3 of violating section "28900(A)(1)."

Defendant concedes that he did not object to the verdict form and the error is harmless.

However, defendant requests and the People agree that on remand, the court must correct the minute order and abstract of judgment to state the correct statutory violation for count 3.

### D.    Hearing to Make a Record for an Eventual Youth Offender Parole Hearing

Defendant filed a supplemental brief and requested remand for a hearing to make a record of information relevant to an eventual youth offender parole hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261.

The People agree that such a hearing is appropriate since defendant was 25 years old when he committed the offenses in this case, and section 3051 has been amended to require youth offender parole hearings for offenders who were 25 years of age or younger at the time of the crime.

### E.    Section 12022.53

Finally, defendant contends, and the People agree, that on remand, the court must consider whether to exercise its discretion to strike any of the firearm enhancements imposed pursuant to section 12022.53, subdivision (d), based on the recent statutory amendments that have granted such discretion to sentencing courts.

Therefore, on remand, the court shall consider whether to strike the indeterminate terms imposed pursuant to the section 12022.53, subdivision (d) firearm enhancements.

We do not find that the court must strike the enhancements, but only that the court must consider whether to exercise its discretion in furtherance of justice pursuant to the newly-enacted statutory provision. (Stats. 2017, ch. 682, § 2 (Sen. Bill No. 620), eff. Jan. 1, 2018; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090–1091.)

## VI. The Court's Imposition of Restitution Fines, Fees, and Assessments

Defendant argues the court violated his constitutional rights to due process and equal protection because it ordered him to pay restitution fines, fees, and assessments without conducting a hearing to determine whether he had the ability to pay those amounts. Defendant did not object to the court's orders but argues he has not forfeited review because any objection would have been futile under the statutory and case law at that time, and the issue raises a pure legal question. Defendant requests this court remand the matter for the trial court to conduct a hearing on his ability to pay so that it can either strike or stay the amounts previously imposed.

Defendant's due process arguments are based on *People v. Dueñas, supra,* 30 Cal.App.5th 1157, that was decided after his sentencing hearing was held and while this appeal was pending. We disagree with *Dueñas's* due process analysis and find a defendant's constitutional challenge to the court's imposition of such amounts should be raised under the Eighth Amendment to the United States Constitution to determine whether the fines, fees, and assessments are "grossly disproportional to the gravity of a defendant's offense" and thus "excessive." (*United States v. Bajakajian* (1998) 524 U.S. 321, 334 (*Bajakajian*), superseded on other grounds as explained in *U.S. v. Jose* (1st Cir.P.R. 2007) 499 F.3d 105, 110.)

We also find that, to the extent defendant attempts to rely on *Dueñas*, he forfeited review of his ability to pay argument by failing to object when the sentencing court imposed restitution fines above the statutory minimum, and any error is harmless beyond a reasonable doubt because the record shows he has the ability to pay the amounts ordered in this case.

### A.    *The Sentencing Hearing*

We begin with the sentencing hearing that was held in May 2016, before *Dueñas* was decided.

The court found multiple aggravating factors, no mitigating factors, and sentenced defendant to an aggregate term of 80 years to life for two counts of attempted murder with firearm enhancements, and one count of possession of a firearm by a felon.  The court followed the probation report's recommendation and imposed the maximum statutory restitution fine of $10,000 (§1202.4, subd. (b))[19], and imposed and stayed the parole revocation fine of $10,000 (§ 1202.45).  The court also imposed the court

---

[19] Section 1202.4, subdivision (b) mandates the court to impose a "separate and additional restitution fine" in "every case where a person is convicted of a crime," unless the court "finds compelling and extraordinary reasons for not doing so and states those reasons on the record."  Upon conviction of a felony, the minimum fine is $300 and the maximum fine is $10,000.  (§ 1202.4, subd. (b)(1).)  "In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."  (§ 1202.4, subd. (b)(2).)

"The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record.  *A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine.  Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)....*"  (§ 1202.4, subd. (c), italics added.)

If the court sets the restitution fine *in excess* of the minimum amount, it shall consider "any relevant factors, including, but not limited to, *the defendant's inability to pay*, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime.  …. Consideration of a defendant's *inability to pay may include his or her future earning capacity.  A defendant shall bear the burden of demonstrating his or her inability to pay*.  Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required."  (§ 1202.4, subd. (d), italics added.)

operations assessment of $120 (§ 1465.8)[20] and the court facilities funding assessment of $90 (Gov. Code, § 70373).[21]

The court also sentenced defendant to a consecutive lower term of two years for assault with a deadly weapon; the conviction was based on defendant's assault on his cellmate during the pendency of his trial. The court again followed the probation report's recommendation and imposed a restitution fine of $600, an amount above the statutory minimum, and imposed and stayed the parole revocation fine of $600. The court also imposed a $40 court operations assessment (§ 1465.8); and a $30 court facilities funding assessment (Gov. Code, § 70373).

Defendant was thus ordered to pay a total of $10,600 in restitution fines, $160 in court operations assessments, and $120 in court facilities funding assessments. The court did not order any victim restitution. Defense counsel objected to the court's findings on aggravating and mitigating factors but did not object to the court's imposition of any of the fines, fees, and assessments.

The court stated the public defender's office had requested reimbursement of attorney fees in the amount of $50,000. The court denied the request because "[i]n light of the life sentence that [defendant] has been sentenced to, I'm gonna [*sic*] find no ability [to pay]."[22]

---

[20] Section 1465.8, the court operations assessment, requires the court to impose an assessment of $40 on "every conviction for a criminal offense," with certain exceptions, "[t]o assist in funding court operations." (§ 1465.8, subd. (a)(1).) It does not refer to a defendant's ability to pay.

[21] Government Code section 70373, the court facilities funding assessment, requires the court to impose an assessment on every criminal conviction, with certain exceptions, "[t]o ensure and maintain adequate funding for court facilities," in the amount of $30 for each misdemeanor or felony, and $35 for each infraction. (Gov. Code, § 70373, subd. (a)(1).) It does not refer to the defendant's ability to pay.

[22] As we will discuss below, section 987.8, subdivision authorizes the court to order a defendant to repay the courts of appointed counsel upon notice and a hearing, but presumes a defendant sentenced to state prison does not have the ability to reimburse

## B. Dueñas, Castellano, *and* Frandsen

In *Dueñas*, *supra*, 30 Cal.App.5th 1157, an impoverished defendant had been repeatedly convicted of driving with a suspended license. She lacked the financial means to pay multiple fees imposed for her previous citations and clear her record to obtain a valid license. She remained liable for court fees and the debts were sent to collection agencies. (*Id.* at pp. 1160–1161.) The court subsequently placed the defendant on probation on condition of serving 30 days and paying a $300 fine and offered to convert the fine into an addition nine days in jail. Her attorney agreed because she did not have the ability to pay. The court also ordered her to pay a restitution fine of $150, the statutory minimum for a misdemeanor; $30 for the court facilities assessment (Gov. Code, § 70373); and $40 for the court operations assessment (§ 1465.8). It did not impose victim restitution. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1162, 1169.)

After the court imposed the fees and fines, it granted the defendant's motion for a hearing on her ability to pay the attorney fees she had previously been assessed with under section 987.8, subdivision (b), and also to challenge the other fines and fees. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1162–1163.) The defendant introduced uncontested evidence about her indigence. The court determined she lacked the ability to pay the previously-ordered attorney fees and waived them. The court found the assessments imposed under section 1465.8 and Government Code section 70373 were mandatory regardless of her inability to pay. The court further found she failed to show the " 'compelling and extraordinary reasons' " required by section 1202.4, subdivision (c) to justify waiving the minimum $150 restitution fine. (*Dueñas*, *supra*, at p. 1163.) The court rejected defendant's argument that due process and equal protection required it to determine her ability to pay the fees and fines or strike the orders. (*Ibid.*)

---

these costs absent unusual circumstances. (*People v. Rodriguez* (2019) 34 Cal.App.5th 641, 645–646.)

66.

*Dueñas* held the trial court's imposition of these amounts without finding the defendant had the ability to pay, and "using the criminal process to collect a fine she cannot pay is unconstitutional" because "the only reason [the defendant] cannot pay the fine and fees is her poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.)

> "We conclude that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's *present ability* to pay before it imposes court facilities and court operations assessments under … section 1465.8 and Government Code section 70373. We also hold that although … section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has *the present ability* to pay the restitution fine." (*Id.* at p. 1164, italics added.)

In reviewing the fees and assessments, *Dueñas* found that section 1465.8 and Government Code section 70373 were not enacted with the intent to be punitive in nature, but they had been "parts of more comprehensive legislation intended to raise funds for California courts." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.) The Legislature had provided "fee waivers for indigent litigants at the trial and appellate court levels that excuse them from paying fees for the first pleading or other paper, and other court fees and costs, including assessments for certain court investigations," and listed several statutory examples. These waivers lessened "the disproportionate burden that these fundraising fees present to indigent litigants in the civil context." (*Id.* at pp. 1165–1166.) By comparison, the Legislature failed to enact "a corresponding safeguard for assessments attached to a criminal conviction," since both section 1465.8 and Government Code section 70373 were silent as to the consideration of a defendant's ability to pay in imposing the assessments. (*Dueñas*, at p. 1166.)

*Dueñas* held that, in the absence of such waivers and safeguards, the probationer faced significant consequences "if she blamelessly fails to pay her assessments," whether those amounts are "considered as a criminal penalty or as a civil judgment." (*Dueñas*,

*supra*, 30 Cal.App.5th at p. 1168.)  "These additional, potentially devastating consequences suffered only by indigent persons in effect transform a funding mechanism for the courts into *additional punishment* for a criminal conviction for those unable to pay."  (*Ibid*., italics added.)

*Dueñas* reversed the two assessments because imposing them "upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution. [Citations.]  These fees, assessed as part of a larger statutory scheme to raise revenue to fund court operations, should be treated no differently than their civil counterparts enacted in the same legislation and imposed only on those with the means to pay them. [Citation.]"  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169, fns. omitted.)[23]

As for the restitution fine, *Dueñas* recognized that it was intended to be additional punishment, but it posed constitutional concerns where the fines are imposed as conditions of probation.  Any unpaid restitution fines remaining at the end of probation are enforceable as a civil judgment, and the debt may be enforced by litigation or offset against any amounted owed to the defendant by a state agency.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1169–1170.)  "[A]lthough … section 1202.4 permits the court to waive imposition of a restitution fine if it finds 'compelling and extraordinary reasons' why the fine should not be imposed, the statute expressly states that inability to pay the fine does not qualify" when the minimum fine is imposed.  (*Id.* at p. 1170 and fn. 6.)  As a result, "the criminal justice system punishes indigent defendants in a way that it does not punish wealthy defendants," who may have the charges dismissed after the successful

---

[23] *Dueñas* relied on *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660 to reach these conclusions, and rejected the People's argument that these cases were distinguishable because the defendants therein faced imprisonment only on the basis on their poverty, while the defendant in *Dueñas* was subject to a civil judgment she could not satisfy.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1167–1168.)

completion of probation. (*Id*. at p. 1170) "But if a probationer cannot afford the mandatory restitution fine, through no fault of his or her own he or she is categorically barred from earning the right to have his or her charges dropped and to relief from the penalties and disabilities of the offense for which he or she has been on probation, no matter how completely he or she complies with every other condition of his or her probation." (*Ibid*.)

> "The statutory scheme thus results in a limitation of rights to those who are unable to pay. The heart of the due process inquiry is whether it is 'fundamentally unfair' to use the criminal justice system to impose punitive burdens on probationers who have 'made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of [their] own ....' [Citation.]" (*Id*. at p. 1171.)

*Dueñas* remanded the matter to the superior court to stay execution of the restitution fine "until and unless *the People* demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1172–1173, italics added.)

In *People v. Castellano* (2019) 33 Cal.App.5th 485 (*Castellano*), the defendant was convicted of possession of cocaine base for sale with prior conviction enhancements and sentenced to six years, split between three years in local custody and three years on mandatory supervised release. The court ordered him to pay the statutory minimum $300 restitution fine (§ 1202.4, subd. (b)) and other fees and assessments. The sentencing hearing was held before *Dueñas* was decided. The defendant did not object to any of the amounts imposed by the court. On appeal, after *Dueñas* was decided, the defendant argued the fines and fees similarly violated his due process rights, and the appellate court should strike the trial court's orders because it failed to find he had the ability to pay. (*Castellano*, at pp. 487, 488.)

*Castellano* held the defendant did not forfeit appellate review of his ability to pay claim, even though he did not object at the sentencing hearing, because *Dueñas* had not yet been decided, "no California court prior to *Dueñas* had held it was unconstitutional to

impose fines, fees or assessments without a determination of the defendant's ability to pay," and *Dueñas* was based on "a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial." (*Castellano*, *supra*, 33 Cal.App.5th at p. 489.) In addition, the relevant statutory authority did not allow the sentencing court to consider a defendant's ability to pay since it imposed the minimum restitution fine. (*Ibid*.)

As to the merits, *Castellano* rejected the defendant's assertion that *Dueñas* required the summary reversal of the fees and fines that had been imposed at the sentencing hearing. *Castellano* distinguished *Dueñas* since the probationer in that case requested a hearing and presented credible evidence she lacked the ability to pay. *Castellano* further held that *Dueñas* required "a defendant … in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court." (*Castellano*, *supra*, 33 Cal.App.5th at p. 490.)

However, *Castellano* concluded that since the defendant's conviction and sentence were not yet final, *Dueñas* applied to his case, and the matter should be remanded to the trial court "so that he may request a hearing and present evidence demonstrating his inability to pay the fines, fees and assessments imposed by the trial court." (*Castellano*, *supra*, 33 Cal.App.5th at p. 491.)

> "If he demonstrates the inability to pay, the trial court must strike the court facilities assessment (Gov. Code, § 70373), the court operations assessment ([] § 1465.8) and the criminal laboratory analysis fee (Health & Saf. Code, § 11372.5); and it must stay the execution of the restitution fine. If [he] fails to demonstrate his inability to pay these amounts, the fines, fees and assessments imposed may be enforced." (*Ibid*.)

In *People v. Frandsen* (2019) 33 Cal.App.5th 1126 (*Frandsen*), the court sentenced defendant to prison and imposed the statutory maximum restitution fine of $10,000, in addition to other fees and assessments. The sentencing hearing was held

before *Dueñas* was decided, and the defendant did not object to the fees and fines. (*Frandsen*, at pp. 1139, 1152–1153.) *Frandsen* held the defendant forfeited his appellate arguments based on *Dueñas* about his ability to pay the fines and fees because he failed to object at the sentencing hearing to the restitution fine that was imposed above the statutory minimum, he was raising a question of fact and not of law, and there was nothing in the record to indicate that he would have been foreclosed from making the same objections as the probationer in *Dueñas.* (*Frandsen*, *supra*, 33 Cal.App.5th at pp. 1153–1154.)

*Frandsen* also "fundamentally" disagreed with *Castellano* on the assertion that *Dueñas* was " 'a dramatic and unforeseen change in the law,' " since the defendant in *Dueñas* "foresaw it" by raising the ability to pay issue based on existing cases. (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) "*Dueñas* applied law that was old, not new." (*Id*. at p. 1155.)

### C. *Defendant's Contentions*

In this appeal, defendant acknowledges that he did not object to the court's imposition of the fines, fees, and assessments at the sentencing hearing, or claim that he lacked the ability to pay those amounts. However, defendant asserts that he is in the same position as the defendant in *Castellano,* who also failed to object but still obtained relief on the same issue. Defendant asserts that he did not forfeit appellate review since he could not have anticipated the holding in *Dueñas.* Defendant argues that under *Castellano,* the instant matter must be remanded to the trial court so that he can raise a constitutional objection based on *Dueñas*, and the court can determine whether he has the ability to pay the fines, fees, and assessments.

Defendant's argument is based on the supposition that *Dueñas* was correctly decided. We disagree and find that it is more appropriate to rely upon the Eighth Amendment to raise a constitutional challenge to the court's imposition of statutorily mandated fines, fees and assessments.

71.

**Dueñas *was Wrongly Decided*[24]**

We find that *Dueñas* was wrongly decided and agree with Justice Benke's concurring opinion in *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, petition for review pending, petition filed on July 15, 2019,[25] that *Dueñas's* analysis is "fundamentally flawed in that general 'fairness' grounds of due process and/or equal protection principles do not afford a defendant a preassessment ability-to-pay hearing before a trial court imposes fines and fees on him or her." (*Gutierrez, supra*, at p. 1038 (conc. opn. of Benke, J.); see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 81–83 (conc. opn. of Benke, J.) and *People v. Santos* (Aug. 15, 2019, H045518) __ Cal.App.5th __ 2019 Cal.App. LEXIS 759, 18–27 (dis. opn. of Elia, J.).)

> "[I]n reaching its conclusions, *Dueñas* by judicial fiat inserted language into statutes that did not exist. That is, I note the adjective 'present' used by the *Dueñas* court in its ability-to-pay analysis is nowhere to be found in … sections 1202.4 and 1465.8, or in Government Code section 70373. [Citations.]
>
> "Perhaps more egregiously, *Dueñas* in its analysis completely disregarded unambiguous language in subdivision (c) of section 1202.4

---

[24] As noted in *Castellano*, a bill is currently pending in the Legislature that "proposes the following factors be considered in determining a defendant's ability to pay: the defendant's present financial circumstances; whether the defendant is receiving any type of government benefits, including means-tested benefits; whether the defendant was represented by court-appointed counsel; the defendant's reasonably discernible future financial circumstances; the likelihood the defendant will be able to obtain employment within a six-month period from the date of the court's consideration of the issue; the amount of victim restitution ordered, if any; and any other factor that may bear upon the defendant's inability to pay. (Assem. Bill No. 927 (2019–2020 Reg. Sess.) § 1.)" (*People v. Castellano, supra*, 33 Cal.App.5th at p. 490, fn. 5.) This bill has not yet been enacted. In any event, we are compelled to address the issues raised by the defendant.

[25] The majority opinion in *Gutierrez* did not address whether *Dueñas* was correctly decided. Instead, it found the defendant forfeited appellate review by failing to raise an ability to pay objection under existing statutory law because the court imposed the maximum restitution fine. Since the defendant chose not to object to the $10,000 restitution fine, "he surely would not complain on similar grounds regarding an additional $1,300 in fees." (*Gutierrez, supra*, 35 Cal.App.5th at p. 1033 (maj. opn. of Haller, J.).)

stating that inability to pay cannot be considered when only the statutory minimum is imposed, as was the case there. Moreover, by also adding the word 'present' to the ability-to-pay analysis with respect to the restitution fine, *Dueñas* ignored section 1202.4, subdivision (d), which says the exact opposite: 'Consideration of a defendant's inability to pay may include his or her *future earning capacity*.' (Italics added.) A court lacks the power to rewrite a statute either so as to make it conform to a presumed intention that is not stated, or to ignore a statute's plain and unambiguous language. [Citation.]" (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1038 (conc. opn. of Benke, J.).)

*Dueñas's* due process and equal protection analysis was improperly based on a series of cases that addressed the concern that "that due process and equal protection guaranteed an indigent criminal defendant a free transcript of trial proceedings in order to provide that defendant with *access* to a court of review, where he would receive an adequate and effective examination of his criminal conviction. [Citation.]" (*Gutierrez*, *supra*, 35 Cal.App.5th at p. 1039 (conc. opn. of Benke, J.).) *Dueñas's* reliance on certain statutes was also incorrect because "[t]hese statutes instead ensure that all people, without regard to economic status, have equal access to our justice system." (*Gutierrez*, *supra*, at p. 1039 (conc. opn. of Benke, J.).) The fine and assessments imposed on the probationer in *Dueñas* did not raise "an issue of *access* to our courts or justice system" or satisfy "the traditional due process definition of a taking of life, liberty or property." (*Gutierrez*, *supra*, p. 1039 (conc. opn. of Benke, J.).)

> "[There is] no general due process and equal protection authority which *requires* a court to conduct a *preassessment present ability-to-pay* hearing before imposing any fine or fee on a defendant, as *Dueñas* seems to conclude. On a practical note, it takes little imagination to envision the potential expansion of the holding of *Dueñas* to a multitude of other fines or fees that were not the subject of that case, or the instant case. One such possible fine is victim restitution, which is encompassed in subdivision (f) of section 1202.4 – one of the same statutes at issue in *Dueñas*. Although that subdivision expressly requires a court to order 'full restitution' to the victim, should the constitutional basis of *Dueñas* stand, any restitution hearing might require a finding of *present ability* to pay victim restitution." (*Ibid*.)

*Dueñas* thus incorrectly relied upon a due process analysis to examine the probationer's constitutional objections to the court's imposition of the fines, fees, and assessments in that case. We further find *Castellano* incorrectly extended *Dueñas*'s due process analysis to cases where a defendant is sentenced to prison and ordered to pay such amounts.

### D.     The Eighth Amendment

While we reject *Dueñas's* due process analysis, a defendant who raises a constitutional objection at a sentencing hearing, based on his or her inability to pay statutorily mandated fines, fees, and assessments, is not without a remedy. Such a challenge should be based instead on the prohibition against "excessive fines" contained in the Eighth Amendment to the United States Constitution, as recently applied to state action in *Timbs v. Indiana* (2019) ___ U.S. ___ [139 S.Ct. 682].)[26]

"Like the Eighth Amendment's proscriptions of 'cruel and unusual punishment' and '[e]xcessive bail,' the protection against excessive fines guards against abuses of government's punitive *or* criminal-law-enforcement authority. This safeguard, we hold, is 'fundamental to our scheme of ordered liberty,' with 'dee[p] root[s] in [our] history and tradition.' [Citation.] The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment." (*Timbs v. Indiana, supra,* 139 S.Ct. at pp. 686–687, italics added.)

An Eighth Amendment analysis is more appropriate because such an analysis "allows for consistent and fair review of fines and fees imposed on individuals while they are focused both legally and factually in the trial court, with the appeal process remaining

---

[26] The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted." (Italics added.) Article I, section 17 of the California Constitution states: "Cruel or unusual punishment may not be inflicted *or excessive fines imposed*." (Italics added.)

available for review." (*Gutierrez, supra*, 35 Cal.App.5th at p. 1040 (conc. opn. of Benke, J.).)

"The Eighth Amendment prohibits the imposition of excessive fines. The word 'fine,' as used in that provision, has been interpreted to be ' "a payment to a sovereign as punishment for some offense." ' [Citation.]" (*Gutierrez, supra*, 35 Cal.App.5th at p. 1040 (conc. opn. of Benke, J.).) The determination of whether a fine is excessive for purposes of the Eighth Amendment is based on the factors set forth in *Bajakajian, supra,* 524 U.S. 321. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co*. (2005) 37 Cal.4th 707, 728.)

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. [Citations.] [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." (*Bajakajian, supra,* 524 U.S. at p. 334.)

The California Supreme Court has summarized the factors in *Bajakajian* to determine if a fine is excessive in violation of the Eighth Amendment: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay. [Citations.]" (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra,* 37 Cal.4th at p. 728; *Gutierrez, supra*, 35 Cal.App.5th at p. 1040 (conc. opn. of Benke, J.).) While ability to pay may be part of the proportionality analysis, it is not the only factor. (*Bajakajian, supra,* 524 U.S. at pp. 337–338.)

In *People v. Urbano* (2005) 128 Cal.App.4th 396, the defendant was convicted of assault by means likely to produce great bodily injury. (*Id*. at p. 400.) This court relied on *Bajakajian* to reject the defendant's claim that a $3,800 restitution fine (§ 1202.4, subd. (b)(1)) was excessive under the state and federal Constitutions. "The record of a completely unprovoked attack by a two-striker causing great bodily injury solely to

75.

promote a criminal street gang amply justifies the amount at issue." (*People v. Urbano, supra*, at p. 406.)

In *Gutierrez*, the defendant was convicted of nine counts of committing lewd and lascivious acts upon a child, along with prior strike convictions, and sentenced to 35 years plus 100 years to life. (*Gutierrez, supra*, 35 Cal.App.5th at pp. 1028–1029 (maj. opn. of Haller, J.).) The concurring opinion, having rejected *Dueñas's* due process analysis, found a constitutional objection to such amounts should be based on the Eighth Amendment. It also found that based on defendant's claimed inability to pay the $10,000 restitution fine, the $360 court security fee (§ 1465.8), the $270 fee under Government Code section 70373, and the $154 criminal justice administration fee under Government Code section 29550.1, an Eighth Amendment challenge would have been meritless because those amounts were not " 'excessive' " in violation of either the federal or state Constitutions based on the proportionality factors in *Bajakajian*. (*Gutierrez, supra*, 35 Cal.App.5th p. 1040 (conc. opn. of Benke, J.).)

### 1. Application of Eighth Amendment to Fees and Assessments

We find an Eighth Amendment analysis is appropriate to address a defendant's constitutional challenge to both restitution fines as well as other fees and assessments imposed after conviction.

"The Excessive Fines Clause … 'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense." ' [Citation.]" (*Bajakajian, supra,* 524 U.S. at p. 328.) Restitution fines imposed under section 1202.4, subdivision (b) are recognized as criminal penalties and a form of punishment. (*People v. Hanson* (2000) 23 Cal.4th 355, 361–363; *People v. Harvest* (2000) 84 Cal.App.4th 641, 647 (*Harvest*).)[27]

---

[27] In contrast to restitution fines, *victim restitution* imposed under section 1202.4, subdivision (e) is not defined as punishment since it is paid to the victim as compensation for loss and not to " 'a sovereign as punishment for some offense.' " (*Harvest, supra*, 84

*Dueñas* recognized the court facilities and court operations assessments were not enacted to be "punitive in nature," but instead were part "of more comprehensive legislation intended to raise funds for California courts." (*Dueñas, supra*, 30 Cal.App.4th at pp. 1164–1165.) As explained above, however, *Dueñas* also found a defendant could raise a constitutional challenge to the imposition of fees and assessments because the "potentially devastating consequences" suffered by indigent persons unable to pay those amounts "in effect transform a funding mechanism for the courts into *additional punishment* for a criminal conviction for those unable to pay." (*Id.* at p. 1168, italics added.) *Dueñas* essentially held that fees and assessments, like restitution fines, constitute "punishment" for purposes of a constitutional challenge. (*Ibid.*)

### 2. Analysis Under the Eighth Amendment

We may review de novo whether a fine is excessive under the Eighth Amendment. (*Bajakajian, supra,* 524 U.S. at p. 336, fn. 10*.*)

We find the $10,000 restitution fine, the court operations assessment of $120, and the court facilities funding assessment of $90 are not grossly disproportionate to defendant's convictions for attempting to murder the two officers and possession of a firearm by a felon. Defendant repeatedly refused to stop when the officers lawfully ordered him to. He entered private residences without permission, concealed himself inside rooms and within garages, and evaded detection until Officer Collins found him in a bedroom closet. Collins holstered his service weapon and directed defendant to step

---

Cal.App.4th at pp. 647, 650; *Gutierrez, supra*, 35 Cal.App.5th at p. 1040 (conc. opn. of Benke, J.).) The concurring opinion in *Gutierrez* cautioned that *Dueñas's* due process analysis could be extended to victim restitution orders. (*Gutierrez, supra*, at p. 1039 (conc. opn. of Benke, J.).) Indeed, in *U.S. v. Dubose* (9th Cir.1998) 146 F.3d 1141, 1144–1145, the court relied on *Bajakajian* and held that under the federal restitution law, victim restitution awards are punishment and may be subject to the excessive fines clause if they are grossly disproportional to the criminal offense. However, the court further held proportionality between the defendant's illegal activities and the victim's loss is inherent in a victim restitution order. (*U.S. v. Dubose*, at p. 1144–1145.)

outside. Instead of doing so, defendant fired multiple gunshots at point-blank range at the officers who tried to take him into custody. He shot Collins in the shoulder, fired additional shots when Officer Ferreira tried to assist Collins, shot Ferreira in the shoulder, kept firing and hit Collins in the chest. Collins was shot four times and Ferreira was shot once. Defendant continued to fire his weapon until additional officers arrived in the small bedroom, returned fire, and wounded and disarmed him.

We similarly find the $600 restitution fine, the $40 court operations assessment, and the $30 court facilities funding assessment imposed for his assault conviction are not grossly disproportionate under the relevant factors. According to the victim, who was defendant's cellmate, defendant became intoxicated after drinking "prison" alcohol and stabbed him numerous times without provocation.

The aggregate amounts of fines, fees, and assessments imposed in defendant's two cases are not grossly disproportionate to his level of culpability and the harm he caused, and thus not excessive under the Eighth Amendment.[28]

### E.    Forfeiture

Even if *Dueñas* applied to this case, defendant forfeited his ability to pay challenge because he failed to object to the amounts imposed at the sentencing hearing. (*People v. Frandsen*, *supra*, 33 Cal.App.5th at p. 1153; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464.)

---

[28] If the probationer in *Dueñas* had raised a constitutional challenge based on the Eighth Amendment, it would have surely led to the trial court's conclusion that the fines and fees imposed in that case were grossly disproportionate and excessive given the undisputed facts about the probationer's dire financial circumstances and minimal criminal culpability. (*Bajakajian, supra,* 524 U.S. at p. 334; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, *supra*, 37 Cal.4th at p. 728.)

## 1. Futility

Defendant asserts he did not forfeit review because any objection at the sentencing hearing would have been futile based on case law and statutory authority that existed at that time; and the *Dueñas* ruling was unforeseeable.

"Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence. [Citations.]" (*People v. Welch* (1993) 5 Cal.4th 228, 237–238.)  While *Dueñas* had not been decided at the time of defendant's sentencing hearing, defendant's futility argument is meritless because "[s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1153.)  In both of defendant's cases, the court imposed restitution fines above the statutory minimum:  $600 for his assault conviction, and $10,000 for his attempted murder and felon in possession convictions.  "[T]he trial court imposed the maximum restitution fine. [The defendant] was thus obligated to object to the amount of the fine and demonstrate his inability to pay anything more than the $300 minimum.  Such an objection would not have been futile under governing law at the time of his sentencing hearing.  [Citations.]" (*Frandsen, supra*, 33 Cal.App.5th at p. 1154.)

The California Supreme Court has repeatedly held that when a court imposes fees and/or fines pursuant to statutes that specifically include ability to pay findings, the defendant must raise an objection at the sentencing hearing or forfeit the appellate claim that the court failed to make such a finding or there was no evidence of the defendant's ability to pay the imposed amounts.  (See *People v. Gamache* (2010) 48 Cal.4th 347, 409; *People v. Case* (2018) 5 Cal.5th 1, 52–53; *People v. Avila* (2009) 46 Cal.4th 680, 728–729; *People v. Nelson* (2011) 51 Cal.4th 198, 227; *People v. McCullough* (2013) 56 Cal.4th 589, 590, 598–599; *People v. Trujillo* (2015) 60 Cal.4th 850, 858–861.)

Despite having the statutory ability to object, defendant did not raise an ability to pay objection to the court's imposition of two restitution fines that were well above the

79.

statutory minimum amounts, and consistent with the amounts recommended in the probation report. "Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed. [Citations.]" (*Frandsen, supra*, 33 Cal.App.5th at p. 1154.)

As in *Frandsen*, we also reject the argument that any objections to the assessments imposed under section 1465.8 and Government Code section 70373 would have been futile. "Although both statutory provisions mandate the assessments be imposed, nothing in the record of the sentencing hearing indicates that [the defendant] was foreclosed from making the same request that the defendant in *Dueñas* made in the face of those same mandatory assessments. [The defendant] plainly could have made a record had his ability to pay actually been an issue. Indeed, [the defendant] was obligated to create a record showing his inability to pay the maximum restitution fine, which would have served to also address his ability to pay the assessments. Given his failure to object to [total restitution fines of $10,600] based on inability to pay, [defendant] has not shown a basis to vacate" the aggregate assessments imposed in this case of $280. (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.)

### 2. Question of Law

Another exception to the rule of forfeiture is when a defendant raises constitutional claims on appeal that "involve pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court. [Citations.]" (*People v. Welch, supra,* 5 Cal.4th at p. 235.)

Defendant has not raised a pure question of law based on undisputed facts, but his contention instead seeks "a factual determination of his alleged inability to pay based on a record that contains nothing more than his reliance on appointed counsel at trial." (*Frandsen, supra*, 33 Cal.App.5th at p. 1153.)

Defendant cannot rely on the court's finding that he lacked the ability to repay the costs of his appointed counsel under section 987.8 as the factual basis for his challenge to

the fines, fees, and assessments. At the sentencing hearing in this case, the court denied the public defender's request for reimbursement of attorney fees in the amount of $50,000 because "[i]n light of the life sentence that [defendant] has been sentenced to, I'm gonna [*sic*] find no ability [to pay]."

Section 987.8 is based on a different statutory scheme than those relied on to impose the fines, fees, and assessments. Section 987.8, subdivision (b) states that in considering the defendant's ability to pay and reimburse the county for the costs of appointed counsel, the court must give defendant notice that such costs may be assessed and an opportunity to be heard. In addition, the court may consider both the defendant's "present financial position and his reasonably discernible financial position during the following six months. [Citation.]" (*People v. Rodriguez, supra,* 34 Cal.App.5th at p. 646.) "But there's an important exception: If the defendant is sentenced to prison or to county jail for more than 364 days, he 'shall be determined not to have a reasonably discernible future financial ability to reimburse' defense costs '[u]nless the court finds unusual circumstances.' [Citation.] [¶] Put another way, there is 'a presumption under the statute that a defendant sentenced to prison does not have the ability to reimburse defense costs.' [Citation.] To rebut this presumption, there must be 'unusual circumstances.' [Citation.]" (*Ibid.*)

*Rodriguez* held the trial court's order to reimburse the costs of appointed counsel in that case was improper, and the defendant did not forfeit the error by failing to object, since the defendant never received the requisite statutory notice of the proposed payment order. In addition, the defendant was sentenced to state prison and not granted probation and, based on the express language of the statute, he was presumed to be unable to pay attorney fees and costs. (*People v. Rodriguez, supra*, 34 Cal.App.5th at pp. 647–648.)

As applied to this case, the sentencing court's finding that defendant lacked the ability to reimburse the county for his public defender was correct under section 987.8 since he was sentenced to state prison. The court's finding does not provide a factual

81.

basis to overcome defendant's failure to object to the imposition of the fines and fees since he received notice of these amounts in the probation report.

### 3. Harmless Error; Ability to Pay

Even if we agreed with *Dueñas* and *Castellano* and found defendant did not waive his objections to the court's failure to conduct a hearing on his ability to pay, we would still reject his constitutional claims and find any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031, petn. for review pending, petn. filed July 31, 2019.)

As explained above, a court's decision to deny a government request for reimbursement of attorney fees under section 987.8 does not similarly mean the defendant lacked the ability to pay the fines and fees imposed in this case. "[A] defendant may lack the 'ability to pay' the costs of court-appointed counsel yet have the 'ability to pay' a restitution fine" or other fees imposed by the trial court. (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.)

" 'Ability to pay does not necessarily require existing employment or cash on hand.' [Citation.] '[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future.' [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody. [Citation.]" (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377.)

We can infer defendant in this case has the ability to pay the fines and fees imposed upon him from probable future wages, including prison wages. (*People v. Douglas*, *supra*, 39 Cal.App.4th at p. 1397.) Prison wages range from $12 to $56 per month, depending on the prisoner's skill level. (Cal. Code. Regs., tit. 15, § 3041.2; Cal.

Dept. of Corrections and Rehabilitation, Adult Institutions Operations Manual (2019), art. 12 (Inmate Pay), §§ 51120.1, 51120.6, pp. 354–356.) The state may garnish between 20 and 50 percent of those wages to pay the section 1202.4, subdivision (b) restitution fine. (§ 2085.5, subds. (a), (c); *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094.)

Defendant suggests the probation report supports an implied finding that he does not have the ability to pay because of certain physical and mental conditions. This claim is refuted by the record. Defendant's mental status was extensively addressed during the pretrial proceedings, he was found competent to stand trial, and he did not satisfy the criteria to plead not guilty by reason of insanity. Defendant testified at trial that he previously attempted suicide, and he was wounded when the officers returned fire. His mental status was further addressed during the trial testimony of the defense expert about his alleged intellectual disabilities. Defendant relied on the expert's testimony for an instruction on mental impairment – that the jury could consider evidence that he may have suffered from a mental disease, defect, or disorder to decide whether he acted with the specific intent to kill for the attempted murder charges. The jury rejected the defense evidence because it found defendant guilty of the two counts of attempted premeditated murder of the officers.

The record shows defendant has the ability to pay the total fines, fees, and assessments imposed by the court while he serves his aggregate prison term of 82 years to life. There is no evidence he suffered any permanent disabilities as a result of the gunshot wounds he received when the assisting officers returned fire. Defendant was held in jail prior to and during his trial without any apparent limitations. Indeed, defendant had the physical ability to attack his cellmate with a homemade weapon while these proceedings were pending, which resulted in his assault conviction.

Defendant's circumstances are vastly different from the probationer's situation in *Dueñas*. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from

either prison wages or monetary gifts from family and friends during his lengthy prison sentence. (See, e.g., § 2085.5, subd. (a); *People v. Potts* (2019) 6 Cal.5th 1012, 1055–1057; *People v. Lewis* (2009) 46 Cal.4th 1255, 1259; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)[29]

## DISPOSITION

The gang enhancement found true for count 3 is reversed for insufficient evidence, and the term imposed and stayed for that enhancement is stricken.[30]

The matter is remanded for the court to correct and clarify the record on the specific sentencing issues set forth in part V, *ante*.

On remand, the court must determine whether to exercise its discretion to dismiss the section 12022.53, subdivision (d) firearm enhancements and the indeterminate terms imposed for those enhancements for counts 1 and/or 2, based on the recent statutory amendments that have granted such discretion to sentencing courts.

Also, on remand, the court shall conduct a hearing for defendant to make a record of information relevant to an eventual youth offender parole hearing.

In all other respects, the judgment as modified – including all fines, fees, and assessments imposed by the trial court – is affirmed.

_____
POOCHIGIAN, Acting P.J.

I CONCUR:


_____
DETJEN, J.

---

[29] The same analysis would apply to the extent that ability to pay is one of the proportionality factors in *Bajakajian*.

[30] Since the trial court stayed the term imposed for the gang enhancement, the striking of that enhancement will not affect defendant's aggregate prison sentence.

84.

PEÑA, J., Concurring.

I concur in the judgment and most of the reasoning employed in the majority opinion. I am reluctant to consider, however, the question of whether *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) was wrongly decided or that the excessive fines clause of the Eighth Amendment is the only constitutional basis for challenging fines if a criminal defendant can establish his or her inability to pay the amount imposed.

The majority opinion examines two cases relevant to the question of forfeiture, *People v. Frandsen* (2019) 33 Cal.App.5th 1126 and *People v. Castellano* (2019) 33 Cal.App.5th 485, but then abruptly pivots to a multipage discussion about the Eighth Amendment. I believe our analysis should begin and end with the forfeiture issue. Given defendant's forfeiture of the inability-to-pay claim, it does not matter whether the merits of his claim could be resolved on due process, equal protection, or Eighth Amendment grounds. (See *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464 [failure to object to various fines and fees resulted in forfeiture of the issue on appeal]; *Frandsen*, at pp. 1153–1154 [limiting analysis of forfeited *Dueñas* claim to dispositive issues of futility and foreseeability].)

Defendant raised no issues with the trial court regarding its imposition of fines and fees. He also failed to present any evidence of an inability to pay the fines and fees. Since no constitutional arguments were made below, the majority opinion's musings about the soundness of *Dueñas* and whether defendant's forfeited claim should be analyzed under the Eighth Amendment constitute dicta, if not an advisory opinion. Because those questions are not properly before us, we should wait for a case in which they are squarely presented and ripe for determination.

My hesitation to criticize *Dueñas* is also based on the extreme set of facts and circumstances involved in that case. The *Dueñas* defendant was an indigent and homeless mother of two who relied on public aid for necessities due, in part, to her cerebral palsy illness. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.) Her driver's

license had been suspended because she was unable to pay $1,088 in assessments stemming from three juvenile citations. (*Id*. at p. 1161.) She then suffered three misdemeanor convictions for driving on a suspended license and "was offered the ostensible choice of paying a fine or serving jail time in lieu of payment." (*Ibid*.) With no financial means to choose the first option, she was repeatedly incarcerated and her outstanding debt continued to increase with each conviction.

Following another misdemeanor conviction for driving on a suspended license, the *Dueñas* defendant challenged the mandatory fees and fines imposed under Government Code section 70373 and Penal Code sections 1465.8 and 1202.4. She also proved her inability to pay the fines and fees. The trial court ruled her indigency was not a valid consideration and thus ordered her to pay the imposed sum. However, the Court of Appeal concluded "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under [the applicable statutes]." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) Furthermore, "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid*.)

Defendant Aviles is not similarly situated to the *Dueñas* defendant. Because the trial court imposed the maximum restitution fine under Penal Code section 1202.4, defendant had a statutory right to object to the fine based on a variety factors, including his inability to pay it. (*Id*., subds. (c), (d).) No objections were made, which renders superfluous any discussion of *Dueñas*, due process rights, and/or the Eighth Amendment. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 138, fn. 5 ["The distinction between minimum and above minimum restitution fines has consequences for the applicability of

2.

[the] forfeiture doctrine"].)  I would thus reserve consideration of those issues for a proper case.

_____

PEÑA, J.